RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
7/13/15
YT

UNITED STATES DISTRICT COURT                          b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CIVIL ACTION |
| | NO. 09-CR-00232 |
| VERSUS | |
| | JUDGE DEE D. DRELL |
| JEREMY BENDER | MAGISTRATE JUDGE JAMES D. KIRK |

### REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a motion to vacate, set aside, or correct sentence filed pursuant to 28 U.S.C. § 2255 by Jeremy Bender ("Bender") on May 20, 2013 (Doc. 102). Bender is challenging his July 2010 conviction pursuant to a guilty plea in the Western District of Louisiana, Alexandria Division, on one count of assault with a dangerous weapon (Doc. 35). Bender was sentenced in March 2011, as career offfender, to 77 months imprisonment (Docs. 75, 76). Bender's conviction and sentence were affirmed on appeal (Doc. 97). U.S. v. Bender, 516 Fed.Appx. 289 (5th Cir. 2012). Bender is presently confined in the United States Penitentiary in Coleman, Florida.

Bender raises the following grounds for relief in his Section 2255 motion:

1.   Ineffective assistance of counsel for failure to properly investigate the specific manner in which Bender was initially charged in all of his prior state convictions (some charges were as a juvenile by the State of Maine, Maine Youth Center) which allowed the court to wrongly classify and sentence Bender as a career criminal.

2.   Ineffective assistance of counsel for failure to inform Bender of each standard that needs to be met to claim self defense.   Had defense counsel properly informed Bender, he would have known he met those standards and would have proceeded to trial.

3.   Ineffective assistance of counsel for failure to obtain the actual hospital reports on the two victims to show whether they were actually injured and the exact extent of their injuries.

4.   Ineffective assistance of counsel for defense counsel's failure to interview any defense witnesses, including the victims, which would have shown Bender was defending himself.  Bender gave defense counsel a list of thirty people who would be positive witnesses for Bender, but he did not contact any of them.   Bender obtained about ten affidavits himself.

5.   Ineffective assistance of counsel for defense counsel's failure to secure discovery material, FBI reports, criminal records of everyone involved, institutional reports of the assault, hospital records, etc.

6.   Ineffective assistance of counsel for defense counsel's failure to provide clear pictures of the incident for evidence.

7.   Ineffective assistance of counsel for defense counsel's failure to properly question the FBI agent who testified at Bender's guilty plea proceeding.

The United States responded to Bender's motion (Doc. 113).

The motion is now before the undersigned Magistrate Judge for

initial review.  See 28 U.S.C. § 2255 and Rule 4(b) of the Federal Rules Governing Section 2255 Proceedings For the United States District Courts, which states in part, "If it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified.  Otherwise, the judge shall order the United States Attorney to file an answer or other pleading within the period of time fixed by the court or to take such other action as the judge deems appropriate."

### Rule 8(a) Resolution

This court is able to resolve the merits of this Section 2255 application without the necessity of an evidentiary hearing because there is no genuine issue of material fact that is relevant to the claims of the petitioner, and the State court records provide the required and adequate factual basis necessary to the resolution of the Section 2255 application.  <u>U.S. v. Green</u>, 882 F.2d. 999, 1008 (5th Cir. 1989); Section 2255 Rule 8(a).

### Facts

The facts of this case, as set forth by the U.S. Fifth Circuit Court of Appeals in <u>U.S. v. Bender</u>, 516 Fed.Appx. at 290, are as follows:

"On October 29, 2008, Bender, then an inmate at the

3

United States Penitentiary in Pollack, Louisiana, was involved in a four-person physical altercation in a cell occupied by inmates Russell Harmon and Andrew Dickerson. Exactly what precipitated this confrontation was the subject of conflicting evidence during Bender's plea hearing and two sentencing hearings.

"Bender gave the following account during his second sentencing hearing. On October 27, Bender and several other inmates told Harmon that he was not welcome among the general population of the prison because he was a child molester. Two days later, Rhyan Driggans, another inmate, told Bender that Harmon wanted to speak with him.1 Accordingly, Bender, accompanied by inmate Stephen Brum, went to the prison unit in which Harmon's cell was located, passed through a metal detector, and explained to an inquiring officer that they were there to speak with Harmon. The officer gave them permission to speak with Harmon for not more than ten minutes.2 Upon entering Harmon's cell, Bender was 'taken aback' because the cell lights were turned off and Harmon was sitting on his table in the dark. Harmon 'abruptly' moved toward Bender and began striking him. Bender noticed at the same time that Brum was fighting with Dickerson, who was also present in the cell.

"As the fight went on, Bender 'heard a loud pop at [his] feet,' looked at the floor, and saw that a shank had fallen in front of him. He 'instinctively grabbed the knife before Harmon could.' It appeared to Bender that Dickerson was stabbing Brum, so Bender stabbed Dickerson, and also stabbed Harmon, who had continuously been striking him. Bender threw the shank to the floor and kept fighting with Harmon. Corrections officers soon arrived and broke up the fight. The officers found a shank near the scene of the fight. Both Harmon and Dickerson suffered injuries and received outside medical care."

<u>Law and Analysis</u>

<u>The Law of §2255 Actions</u>

There are four grounds upon which a federal prisoner may move

to vacate, set aside, or correct his sentence: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255; United States v. Cates, 952 F.2d 149, 151 (5th Cir.), cert. den., 504 U.S. 962, 112 S.Ct. 2319 (1992).  The scope of relief under § 2255 is consistent with that of the writ of habeas corpus. Cates, 952 F.2d at 151.  Also, U.S. v. Placente, 81 F.3d 555, 558 (5th Cir. 1996).

Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice.  Nonconstitutional claims that could have been raised on direct appeal, but were not, may not be asserted in a collateral proceeding.  U.S. v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992).  Also, U.S. v. Ressler, 54 F.3d 257, 259 (5th Cir. 1995).

Moreover, it is settled in this circuit that issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in §2255 motions.  U.S. v. Kalish, 780 F.2d 506, 508 (5th Cir.), cert. den., 476 U.S. 1118, 106 S.Ct. 1977 (1986).  Also, U.S. v. Fields, 761 F.3d 443, 482 (5th Cir.

2014), cert. den., 2015 WL 2473303 (U.S. 6/8/2015); <u>U.S. v. Segler</u>,
37 F.3d 1131, 1134 (5th Cir. 1994).

<u>Ineffective Assistance of Counsel</u>

     To establish that his legal representation at trial fell short
of the assistance guaranteed by the Sixth Amendment, a convicted
defendant must meet the two-pronged test set forth by the Supreme
Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052
(1984).  He must show that his counsel's performance was both
deficient (i.e., that counsel did not provide reasonably effective
assistance under prevailing professional norms) and prejudicial
(i.e., that errors by counsel "actually had an adverse effect on
the defense).  The former component of the test authorizes only
"highly deferential" judicial scrutiny, requiring the defendant to
overcome the presumption that, under the circumstances, the
challenged action might be considered sound trial strategy.  On the
latter component, it is not enough for the defendant to show that
the errors had some conceivable effect on the outcome of the
proceeding; rather, he must demonstrate a reasonable probability
that, but for counsel's unprofessional errors, the result of the
proceeding would have been different.  <u>Anderson v. Collins</u>, 18 F.3d
1208, 1215 (5th Cir. 1994), and cases cited therein.  Also, <u>U.S. v.
Segler</u>, 37 F.3d 1131, 1136 (5th Cir. 1994).

     In the context of a guilty plea, a petitioner must prove not

6

only that his attorney actually erred, but also that he would not have pleaded guilty but for the error. Armstead v. Scott, 37 F.3d 202, 206 (5th Cir. 1994), cert. den., 514 U.S. 1071, 115 S.Ct. 1709 (1995).

In showing he was rendered ineffective assistance of counsel in regard to his sentence, a petitioner must additionally show that there was a "reasonable probability that but for trial counsel's errors the defendant's non-capital sentence would have been significantly less harsh; relevant factors are the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances. U.S. v. Segler, 37 F.3d at 1136.

### 1. Failure to Properly Investigate

First, Bender contends his trial counsel failed to properly investigate the specific manner in which he was initially charged in all of his prior state convictions from Maine-some were juvenile charges from the Maine Youth Center-which allowed the court to wrongly classify and sentence Bender as a career criminal. Although, on direct appeal the Fifth Circuit addressed Bender's claim that the two prior offenses used to charge him under the Armed Career Criminal Act, 18 U.S.C. § 924(e), constituted a

single criminal act, Bender now contends that his defense attorney should have obtained the original charging instrument to prove both offenses were originally charged together.

Bender is complaining that the two robberies (committed on September 13, 1995 and September 22, 1995) of which he was convicted on August 15, 1996 in York County, Maine and the two burglaries (of residences on September 18, 1995 and September 21, 1995) of which he was convicted on November 1, 1996 in Cumberland County, Maine were actually all part of the same "crime spree" and therefore should count as only one crime of violence rather than as two. FN1

---

[1] The sequence of events set forth in the sentencing transcripts from Bender's prior felony offenses in Maine (attached hereto as Appendix A) are as follows:

| Date | Event |
|------|-------|
| 5/26/95 | Bender arrested for having escaped from the Maine Youth Center (S.Ct.Me. 96-1066, 8/16/99, Tr. pp. 28-29). |
| 9/1/95 | Bender released from Maine Youth Center (S.Ct.Me. 96-1066, 8/16/99, Tr. p. 42). |
| 9/13/95 | Bender committed robbery of Mary Gorduris in her home in Saco, ME (S.Ct.Me. 96-1066, 8/16/99, Tr. p. 23). |
| 9/15/95 | Bender committed burglary of Norman Caren's home in Saco, ME (S.Ct.Me. 96-1066, 8/16/99, Tr. p. 27). |
| 9/18/95 | Bender committed reckless conduct with a weapon in Biddeford, ME (S.Ct.Me. 96-1066, 8/16/99, Tr. pp. 25-26). |
| 9/21/95 | Bender committed burglary & theft of Flannery home in Westbrook, ME (S.Ct.Me. 96-1972, 11/1/96, Tr. p. 3). |
| 9/22/95 | Bender attempted to rob Michael Buford, night |

A defendant is designated a career offender if: (1) he was at least eighteen years old at the time he committed the charged offense; (2) the charged offense is a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions that were either crimes of violence or controlled substance offenses. U.S.S.G. § 4B1.1(a).   Prior sentences are counted as separate offenses if an intervening arrest separated the offenses.   U.S.S.G. § 4A1.2(a)(2).   If there was no

---

|  |  |
|---|---|
|  | manager at the Normandy Hotel in Maine (S.Ct.Me. 96-1066, 8/16/99, Tr. pp. 24-25). |
| 9/28/95 | Bender committed burglary & theft of Martin home in Pownal, ME (S.Ct.Me. 96-1972, 11/1/96, Tr. p. 4). |
| 9/28/95 | Bender apprehended in the Maine Youth Center by Trooper Lowell Smith and Bender fully confessed to the Flannery and Martin burglaries to Trooper Smith (S.Ct.Me. 96-1972, 11/1/96, Tr. p. 11). |
| 10/2/95 | Bender was returned to the Maine Youth Center (S.Ct.Me. 96-1066, 8/16/99, Tr. p. 43). |
| June 1996 | Bender placed in York Cty. Jail in Maine (S.Ct.Me. 96-1066, 8/16/99, Tr. p. 43). |
| 8/15/96 | Bender sentenced in York Cty., ME to a total of 6 years imprisonment with all but two years suspended, for 2 counts of robbery, 1 count of reckless conduct with a dangerous weapon, 1 count of burglary, 1 count of escape, and 4 counts of criminal trespass.  (S.Ct.Me. 96-1972, 11/1/96). |
| 11/1/96 | Bender sentenced in Cumberland Cty., ME to a total of six years imprisonment with all but 2 and ½ years suspended, for 2 counts burglary and 2 counts theft.  (S.Ct.Me. 96-1066, 8/16/99). |

intervening arrest, FN2 prior sentences are counted separately unless the sentences resulted from offenses contained within the same charging instrument or the sentences were imposed on the same day.  U.S.S.G. § 4A1.2(a)(2).

The phrase "two prior felony convictions" is defined in Section 4B1.2(3), which then refers to Section 4A1.2 for an explanation as to whether the prior convictions are to be counted separately.  Under Section 4A1.2, prior sentences in unrelated cases are to be counted separately, but prior sentences imposed in related cases are to be treated as one sentence.  Prior sentences are related "if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing."  U.S.S.G. § 4A1.2, Application Note 3.  <u>Shutter v. U.S.</u>, 2007 WL 712284 (E.D.Tex. 2997).

Similar crimes are not necessarily part of a common scheme or plan.  <u>United States v. Garcia</u>, 962 F.2d 479, 482 (5th Cir.), cert. denied, 506 U.S. 902, 113 S.Ct. 293 (1992)(declining to define "common scheme or plan," but holding that two deliveries of heroin

---

[2] In Bender's case, the presentence report (Doc. 77, pp. 8-9) shows two arrest dates for the Maine "crime spree" which took place between September 13, 1995 and October 2, 1995; the arrests are listed on September 21, 1995 and October 2, 1995.  However, the records from Maine show only one arrest date-October 2, 1995.  There was no intervening arrest during the Maine crime spree.

were not part of a common scheme or plan even though the crimes were temporally and geographically alike). Further, prior convictions are not "related" merely because they are part of a crime spree. <u>United States v. Irons</u>, 196 F.3d 634, 638 (6th Cir. 1999). The term "common scheme or plan" must mean something more than repeated convictions for the same criminal offense. The words "scheme" and "plan" are words of intention, implying that the prior offenses have been jointly planned, or at least that it would have been evident that the commission of one would entail the commission of the other as well. However, a crime merely suggested by or arising out of the commission of a previous crime is not related to the earlier crime in the special sense of being part of a common scheme or plan. <u>United States v. Robinson</u>, 187 F.3d 516, 520 (5th Cir. 1999), citing <u>United States v. Ford</u>, 996 F.2d 83, 85 (5th Cir. 1993), cert. den., 510 U.S. 1050, 114 S.Ct. 704 (1994), and <u>United States v. Garcia</u>, 962 F.2d 479, 481 (5th Cir. 1992), cert. den., 506 U.S. 902, 113 S.Ct. 293 (1992).

At Bender's sentencing, defense counsel argued that both of his Maine convictions (the August 15, 1996 robbery conviction(s) in York County and the November 1, 1996 burglary conviction(s) in Cumberland County) were originally charged in a single charging instrument in juvenile court (Doc. 91, p. 10/58). Although Bender was a juvenile when he committed the offenses, the State of Maine

chose to try him as an adult, so (according to Bender) the charges

were split into two separate charging instruments because they fell

within two different jurisdictions in the State of Maine (Doc. 91,

ppp. 10-12/58).  Bender explained as follows (Doc. 91, pp. 16-17):

> "In my case, mine originated from the same charging
> instrument because in the state of Maine, the way they do
> it is, when you're a juvenile, they sentence you to the
> state of Maine. So when you go into a court proceeding,
> you are initially charged from wherever -- whatever
> jurisdiction you're in, but you're held liable because
> you're -- they sentence you to an undetermined sentence
> until the age of [sic] to the state of Maine.
>
> "So technically, whatever charges you receive, they're
> just forwarded to the youth center. And then the youth
> center, they do a formal charging instrument against you
> for all your charges. So all my charges were originally
> charged under the same charging instrument by the Maine
> Youth Center. And then after that, then as I was bound
> over and tried as an adult because of the jurisdiction
> issues, that they happened in two different -- two
> different jurisdictions, then they split it on from
> there. But in the 709 amendment, it says that they were
> in the same original charging instrument. And in my case,
> it was, from the Maine Youth Center.
>
> "And I got a letter here that I tried getting the
> documentation from the Maine Youth Center to try to show,
> but they sent me a response back saying that I had to pay
> for the transcripts and that they would have to look for
> them. So I wrote them back and told them that I didn't
> have the money for it, and they never responded back to
> me. But I was trying to get the documentation for you,
> and I tried contacting one of my old attorneys to try to
> get with Wayne or submit something to the court for you,
> too. All right. I just wanted to elaborate that a little
> bit."

The Fifth Circuit Court of Appeal considered the underlying

issue on direct appeal and held the trial court did not err in

treating Bender's prior offenses separately and in designating Bender a career offender because (1) there was no record evidence that the offenses were originally contained in the same charging instrument (from the Maine Youth Center), (2) the two different docket numbers of the cases were evidence that they were charged separately in juvenile court, and (3) Bender was eventually prosecuted as an adult for the two offenses under two separate case numbers in two separate jurisdictions.  U.S. v. Bender, 516 Fed.Appx. at 294-295.  Bender now contends his attorney was ineffective for failing to obtain the original charging instrument from the Maine Youth Center.

However, it is quite clear under Fifth Circuit jurisprudence that, although the crimes are temporally close, they were each individual events.  On September 13, 1995, Bender committed robbery of Mary Gorduris in her home in Saco, Maine (S.Ct.Me. 96-1066, 8/16/99, Tr. p. 23/44).  On September 21, 1995, Bender committed burglary in the Flannery home in Westbrook, ME (S.Ct.Me. 96-1972, 11/1/96, Tr. p. 3).  On September 22, 1995, Bender committed robbery of Michael Buford, night manager at the Normandy Hotel in Maine (S.Ct.Me. 96-1066, 8/16/99, Tr. pp. 24-25).  On September 28, 1995, Bender committed burglary of the Martin home in Pownal, Maine (S.Ct.Me. 96-1972, 11/1/96, Tr. p. 4).  The burglaries on September 21 and 28 were separated in both time and place from the robberies

13

which took place on September 13 and 22, each of the crimes involved a different set of victims, and there is no evidence that the crimes were all part of a common scheme or plan.  Therefore, the burglaries (Maine case no. CR96-1972) and the robberies (Maine case no. CR96-1066) were correctly treated as two separate prior convictions for violent offenses for purposes of classifying Bender as a career offender under the U.S. Sentencing Guideline, regardless of whether they were originally included in the same charging instrument by the Maine Youth Center.

Bender has not shown that, even if all of his "crime spree" offenses had been listed in the original charging instrument form the Maine Youth Center, he would not have been found to be a career offender.   Therefore, Bender's has not shown that he had ineffective assistance of counsel due to counsel's failure to obtain the original charging instrument(s) from the Maine Youth Center.

This ground for relief is meritless.

### 2. Self Defense

Next, Bender contends he had ineffective assistance of counsel because his trial attorney failed to inform him of each standard that needs to be met to claim self defense.  Had defense counsel properly informed Bender, he would have seen he met those standards and proceeded to trial.

14

Bender raised the underlying claim on direct appeal, contending that he had acted in self-defense and that, had he understood that he was not guilty of the charged crime, he would not have pleaded guilty.  The Fifth Circuit found that Bender did not prove the district judge erred in accepting his guilty plea because Bender admitted, at his sentencing, that he had considered and rejected pursuing self-defense prior to pleading guilty because he had not wanted to risk being tried and convicted. FN3  U.S. v. Bender, 516 Fed.Appx. at 293.  Therefore, that issue should not be revisited by the this court.  Fields, 761 F.3d at 482.  Moreover, Bender has not explained what elements of self defense he did not understand when he pleaded guilty and how that affected his plea.

Since, as found by the Fifth Circuit Court of Appeals, Bender cannot show there is a reasonable probability that he would not have pleaded guilty had he been advised by his attorney as to the standards for proving self defense, Bender has not shown that he had ineffective assistance of counsel.  This ground for relief is meritless.

_____

[3] At his sentencing, Bender testified (Doc. 91, p. 49/58): "And I pled guilty, like I told you originally, because of the circumstances that were involved in this case, that I didn't want to take my chance of going to trial and trying to have a self-defense case or something and then be convicted or whatever, because the point is, I did ultimately stab at them inmates or stab those inmates."

### 3. Hospital Reports

Next, Bender contends his trial counsel was ineffective for failing to obtain the actual hospital reports on the two victims to show whether they were injured and the extent of their injuries.

Bender was convicted of assault with a dangerous weapon, 18 U.S.C. § 133(a)(3), which is: "assault with a dangerous weapon, with intent to do bodily harm."   See <u>United States v. Estrada-Fernandez</u>, 150 F.3d 491, 494 (5th Cir. 1998).   Physical contact with the victim is not an element of assault with a dangerous weapon.   <u>Estrada-Fernandez</u>, 150 F.3d at 494.   Therefore, the question of whether or not the victims, Dickerson and Harmon, were actually injured by Bender does not affect Bender's guilty plea.

Although Bender contends there is a question as to whether Harmon and Dickerson were injured, he admitted at his sentencing that he stabbed both Dickerson and Harmon. FN4   Therefore, there does not appear to be any real contention that the victims were not actually injured to some extent.

Bender received a four-point sentencing guidelines enhancement for having injured the victims (Doc. 77; Doc. 91, p. 9/58).   The

---

[4] "In summary, I'd like to state that I do fully admit to stabbing both Dickerson and Harmon; however, I never had any intention at any time to stab or fight Harmon or Dickerson, nor did I ever initiate any such activity."   (Doc. 91, p. 21/58).

presentence report initially gave a five-point enhancement due to the severity of the injuries (Doc. 77).  On review, the enhancement was reduced to four points, since the severity of the injuries was not proven (Doc. 77).

At his sentencing, Bender admitted that he stabbed Dickerson and Harmon.  On direct appeal, the Fifth Circuit found that both Dickerson and Harmon suffered some injuries and received outside medical care.

Since Bender admitted that he stabbed Dickerson and Harmon, he apparently inflicted some kind of injuries and he received a sentence enhancement for having inflicted non-severe injuries. Therefore, Bender cannot now complain about his sentence enhancement for having inflicted non-severe injuries which he admits he inflicted.

This ground for relief is meritless.

### 4. Uncalled Witnesses

Bender contends his counsel was ineffective for failing to interview any defense witnesses, including the victims, which would have shown Bender was defending himself.  Bender contends he gave defense counsel a list of thirty inmates and ten staff members-people whom, he alleges, would be positive witnesses for him. Bender further contends he obtained about ten affidavits himself and gave them to his attorney.  Bender contends his attorney

admitted that he did not contact any of them.   Bender contends he lived in relative isolation in the SHU during the entire eighteen months from the date of the incident to the conclusion of his court proceedings and that, when his attorney told him he was not going to interview the inmates and staff he had listed as potential defense witnesses, Bender gave up and agreed to the plea bargain when it was offered.

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir. 1993), citing Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 1052, 2066 (1984).   However, bare allegations do not suffice.   A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. Nelson, 989 F.2d at 850, citing United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989).   Complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. Graves v. Cockrell, 351 F.3d 143, 155 (5th Cir. 2003), amended in other part, 351 F.3d 156 (5th Cir. 2003), cert. den., 124 S.Ct. 2160 (U.S. 2004), citing Buckelew v. United States, 575 F.2d 515, 521 (5th

Cir. 1978).  Also, <u>Boyd v. Estelle</u>, 662 F.2d 388, 390 (5th Cir. 1981).  Where the only evidence of a missing witness's testimony is from the defendant, the Court views claims of ineffective assistance with great caution.  <u>Sayre v. Anderson</u>, 238 F.3d 631, 636 (5th Cir. 2001), citing <u>Lockhart v. McCotter</u>, 782 F.2d 1275, 1282 (5th Cir.1986), cert. den., 479 U.S. 1030, 107 S.Ct. 873 (1987).  Unless a petitioner provides the court with affidavits (or similar matter) from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice.  <u>Sayre</u>, 238 F.3d at 636.

In the case at bar, Bender submitted eleven affidavits from inmates who were incarcerated in USP-Pollock in 2009, when Bender and Brum assaulted Harmon and Dickerson (Doc. 111).  Some of those affidavits set forth the circumstances under which Bender was asked by Dickerson and Harmon to meet with them and indicate Bender's lack of prior planning or intent to harm Dickerson and Harmon. Other affidavits explain the arrangement purportedly prevailing at USP-Pollock between the inmates and the prison officials, which indicates some self-policing by the inmate groups in order to facilitate cooperation between the diverse groups of inmates; those affidavits purport to explain why Bender (on behalf of his group of non-gang affiliated whites) was involved in having Harmon (a

19

convicted child molester) placed in the SHU. FN5

_____

[5] Inmate Harmon's and Inmate Dickerson's 2009 affidavits state that Bender did not assault them and they do not want to be witnesses for the government (Doc. 111, Exs. B & C).

Inmate Owens' (undated) affidavit states that he heard his cellmate, Curtis, say that inmates Dickerson and Harmon had both said Bender did not assault them (Doc. 111, Ex. D).

Inmate Curtis' (undated) affidavit states that both Harmon and Dickerson told him Bender did not assault them (Doc. 111, Ex. E).

Inmate Chen's 2009 affidavit states that Dickerson told him that Bender did not assault Dickerson or Harmon (Doc. 111, Ex. F).

Inmate Staine's 2009 affidavit states that Dickerson told him that Bender did not assault Dickerson or Harmon (Doc. 111, Ex. G).

Inmate Jordon's 2013 affidavit states that he was playing handball with Bender when Bender was summoned to go and speak to another inmate (Harmon), and that he would have testified in Bender's defense but Bender's attorney never contacted him (Doc. 111, Ex. H).

Inmates Hymes' 2013 affidavit explains the self-policing agreement between USP-Pollock inmates and the prison staff (which was a result of a large-scale prison riot in 2007) to facilitate cooperation between the diverse groups of inmates, why (according to the agreement) inmate Harmon had to stay in the SHU, why (according to the agreement) Bender was involved in having Harmon put in the SHU, what the consequences would be if Harmon was not placed in the SHU, that Hymes would have testified in Bender's defense, and that Bender's attorney never contacted him (Doc. 111, Ex. I).

Inmate Dunn's 2013 affidavit explains Bender's role in having Harmon placed in the SHU, what the consequences would be in Harmon was not placed in the SHU, the fact that Bender was playing hardball outside when Harmon asked to talk to Bender, that Bender did not intend to assault Harmon, that Dunn would have testified in Bender's defense, and that Bender's attorney never contacted Dunn about Bender's defense (Doc. 111, Ex. J).

Inmate Pappas' 2013 affidavit explains the self-policing agreement between USP-Pollock inmates and the prison staff (which was a result of a large-scale prison riot in 2007) to facilitate cooperation between the diverse groups of inmates, why (according to the agreement) inmate Harmon had to stay in the SHU, why

According to the affidavits from Hymes, Dunn, Pappas and Miller (Doc. 111), after the 2007 prison riot, part of the agreement between the inmates and the prison administration was to have the inmate groups help police their own members, including having "unacceptable" inmates taken out of general population. Harmon, a convicted child molester and thus an "unacceptable" inmate, was part of Bender's group of non-gang affiliated whites and, therefore, Bender's group was responsible for making sure that Harmon was put in the SHU.  Hymes, Dunn, Pappas and Miller also state in their affidavits that, although Harmon was initially housed in the SHU, he was returned to general population, at which point other group leaders told Bender that his group had 24 hours

_____

(according to the agreement) Bender was involved in having Harmon put in the SHU, what the consequences would be to Bender and Bender's group (non-gang affiliated whites) if Harmon was not placed in the SHU, that Pappas had reminded Bender and his group of those consequences if they failed to have Harmon returned to the SHU within 24 hours, and that Pappas would have testified in Bender's defense but Bender's attorney never contacted him (Doc. 111, Ex. K).
    Inmate Miller's 2013 affidavit explains the self-policing agreement between USP-Pollock inmates and the prison staff (which was a result of a large-scale prison riot in 2007) to facilitate cooperation between the diverse groups of inmates, why (according to the agreement) inmate Harmon had to stay in the SHU, why Bender and his group were responsible for having Harmon put in the SHU, that he saw and spoke to Bender before the incident took place and Bender was not behaving out of character and was not armed, and that he would have testified in Bender's defense and helped his attorney find additional defense witnesses, but Bender's attorney never contacted him (Doc. 111, Ex. L).

to arrange for Harmon to return to the SHU; if they failed to do so, all of the other groups would attack Bender's group (Doc. 111). Later that day, Harmon sent another inmate to ask Bender to go and speak with him, and Bender went.

The inmates who would have testified on Bender's behalf would, according to their affidavits (Doc. 111), have testified that Bender was not armed, had not planned in advance to meet with Harmon, and was not planning to assault Harmon and Dickerson. However, none of the affiants state they witnessed the incident, none of the affiants indicate that Bender acted in self-defense, and Bender admitted that he stabbed Harmon and Dickerson.  Although Harmon and Dickerson state in their affidavits that Bender did not assault them and they would not participate in his criminal trial, that does not indicate that Bender acted in self-defense.

Therefore, assuming for purposes of this motion that Bender's attorney did not contact any defense witnesses, Bender has not carried his burden of proving there is a reasonable probability that, had his attorney contacted his witnesses, Bender would have gone to trial (instead of pleading guilty) and that his witnesses' testimony would have resulted in a not guilty verdict.

This ground for relief is meritless.

### 5. Discovery

Next, Bender contends he had ineffective assistance of counsel

because his attorney failed to secure discovery materials such as FBI reports, criminal records of everyone involved, institutional reports of the assault, and hospital records.

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Nelson, 989 F.2d at 850. A determination of whether an investigation is reasonably adequate depends upon a variety of factors, including the number of issues in the case, the relative complexity of those issues, the strength of the Government's case, and the overall strategy of trial counsel. Baldwin v. Maggio, 704 F.2d 1325, 1333 (5th Cir. 1983), cert. den., 467 U.S. 1220, 104 S.Ct. 1669 (1984). Under Strickland, even where trial counsel has failed to adequately investigate a case, a defendant must demonstrate that he has been prejudiced by his counsel's failure. See Lockhart v. McCotter, 782 F.2d 1275, 1282 (5th Cir.1986), cert. den., 479 U.S. 1030, 107 S.Ct. 873 (1987). To show prejudice, the petitioner must prove that an alleged breach of his attorney's duty to investigate resulted in an actual and substantial disadvantage to the course of his defense. Baldwin, 704 F.2d at 1333.

First, although there are no discovery requests filed in the record of this case, it is the usual practice in the local United States Attorney's office for the Assistant United States Attorney in charge of the case to open his or her file to defense counsel

and provide copies of everything in the file, without defense counsel having to file a request for discovery.  While this practice simplifies handling a case for busy defense and government attorneys, it does tend to mislead defendants into believing their counsel did not do anything to prepare their defense and makes it difficult for the courts to assess what was done.

Second, Bender has not alleged what discovery material his defense counsel failed to obtain and how it would have assisted his defense.  As already noted, Bender stated at his sentencing that he had decided not to take the chance of going to trial and presenting a defense of self-defense.

Therefore, this ground for relief is also meritless.

### 6. Clear Photographs

Bender contends his counsel was ineffective for failing to provide clear pictures of the incident for evidence.  However, Bender has not stated what clearer photographs would have shown and how they would have changed the outcome of his proceedings.

This ground for relief is also meritless.

### 7. FBI Agent's Testimony

Bender contends he had ineffective assistance of counsel because his attorney failed to properly question the FBI agent who testified at Bender's guilty plea proceeding.  Bender has not carried his burden of proving what questions should have been

asked, what responses they would have elicited, and how those responses would have changed the outcome of his guilty plea proceeding.

It is noted that Bender's counsel asked the agent, who testified as to what he saw on a prison video that had recorded part of the incident, whether the video showed what occurred in the cell; the agent responded that the video did not show anything that had occurred in the cell and only showed the inmates continuing their fight outside of the cell (Doc. 89, p. 25/30).  Bender's attorney then elicited testimony that made it clear that the video did not show that Bender was the aggressor.

Since Bender has not carried his burden of proving hd had ineffective assistance of counsel, this ground for relief is meritless.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Bender's Section 2255 motion should be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days

after being served with a copy of any objections or response to the District Judge at the time of filing. No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before he makes a final ruling.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

Pursuant to Rule 11(a) of the Rules Governing Section 2255 proceedings for the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate**

of appealability should issue. *See* 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

THUS DONE AND SIGNED in Alexandria, Louisiana on the 13th day of July 2015.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

APPENDIX A

STATE OF MAINE
SUPERIOR COURT                                                **JUDGMENT AND COMMITMENT**

| Docket No. | County | Date | DOB |
|---|---|---|---|
| CR-96-1066 | YORK | 8/15/96 | 3/2/78 |

| State of Maine   v.   Defendant's Name | Residence |
|---|---|
| JEREMY BENDER | BIDDEFORD, ME |

| Offense(s) charged: | | | Charged by: |
|---|---|---|---|

Offense(s) charged:

CT 1 and 2: T17-A MRSA §651      ROBBERY                          CLASS A
CT 2:       T17-A MRSA §651      ROBBERY                          CLASS B
CT 3:       T17-A MRSA §211      RECKLESS CONDUCT WITH A DANGEROUS CLASS C
                                 WEAPON
CT 4:       T17-A MRSA §401      BURGLARY                         CLASS B
CT 5:       T17-A MRSA §755      ESCAPE                           CLASS C
CT 6:       T17-A MRSA §402      CRIMINAL TRESPASS                CLASS E
CT 7,8 & 9: T17-A MRSA §402      CRIMINAL TRESPASS                CLASS D

Plea(s): GUILTY TO CT 1,3,4,5,6,7,8 & 9; GUILTY AS AMENDED IN CT 2

Charged by:
☐ indictment
☒ information
☐ complaint

Offense(s) convicted:

CT 1 and 2: T17-A MRSA §651      ROBBERY                          CLASS A
CT 2:       T17-A MRSA §651      ROBBERY                          CLASS B
CT 3:       T17-A MRSA §211      RECKLESS CONDUCT WITH A DANGEROUS CLASS C
                                 WEAPON
CT 4:       T17-A MRSA §401      BURGLARY                         CLASS B
CT 5:       T17-A MRSA §755      ESCAPE                           CLASS C
CT 6:       T17-A MRSA §402      CRIMINAL TRESPASS                CLASS E
CT 7,8 & 9: T17-A MRSA §402      CRIMINAL TRESPASS                CLASS D

Convicted on:
☑ plea of guilty
☐ plea of nolo
☐ jury verdict
☐ court finding

IT IS ADJUDGED THAT THE DEFENDANT IS GUILTY OF THE OFFENSES AS SHOWN ABOVE AND CONVICTED.

☑ IT IS ADJUDGED THAT THE DEFENDANT BE HEREBY COMMITTED TO THE SHERIFF OF THE WITHIN NAMED COUNTY OR HIS AUTHORIZED REPRESENTATIVE WHO SHALL WITHOUT NEEDLESS DELAY REMOVE THE DEFENDANT TO:

☑ The custody of the Commissioner of the Department of Corrections, at a facility designated by the Commissioner SUSPENDED to be punished by imprisonment for a term of _6 YEARS AS TO CT1; CT2: 4 YEARS CONSECUTIVE TO CT 1; CT3: 2 YEARS CONCURRENT W/CT 1; CT 4: 12 MONTHS CONCURRENT WITH CT 1; CT 5: 364 DAYS CONCURRENT WITH CT 1_

☑ The County jail to be punished by imprisonment for a term of _____ COUNTS 6 THRU 9: 6 MONTHS CONCURRENT W/CT 1 AND TO BE SERVED @ YCJ_

☐ This sentence to be served consecutive to. _____

☐ Execution stayed to on or before: _____ at _____ (a.m.) (p.m.)

☑ IT IS ORDERED THAT ALL (BUT) _2 YEARS AS TO CT1_____ OF THE FOREGOING SENTENCE BE SUSPENDED AND THE DEFENDANT BE COMMITTED TO THE CUSTODY AND CONTROL OF THE DIVISION OF PROBATION AND PAROLE FOR A TERM OF _6YR AS TO CT1 & 4YR AS TO CT 2 – TOTAL OF TEN (10) YEARS_____ UPON CONDITIONS ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN. SAID PROBATION TO COMMENCE (_____) (UPON COMPLETION OF THE UNSUSPENDED TERM OF IMPRISONMENT). THE DEFENDANT SHALL SERVE THE INITIAL PORTION OF THE FOREGOING SENTENCE AT _____

☐ The final _____ month(s) of the unsuspended portion of the term of imprisonment is to be served with intensive supervision under conditions separately specified and incorporated herein.

☐ IT IS ORDERED PURSUANT TO APPLICABLE STATUTES, THAT THE DEFENDANT'S MOTOR VEHICLE OPERATOR'S LICENSE OR PERMIT TO OPERATE, RIGHT TO OPERATE A MOTOR VEHICLE AND RIGHT TO APPLY FOR AND OBTAIN A LICENSE IS SUSPENDED FOR A PERIOD OF _____
☐ IT IS FURTHER ORDERED THAT THE DEFENDANT'S RIGHT TO REGISTER A MOTOR VEHICLE IS SUSPEN-DED AND THE REGISTRATION PLATES ISSUED TO THE DEFENDANT BY THE STATE ARE SUSPENDED.
  ☐ Suspension effective beginning _____ at _____ (a.m.) (p.m.)
  ☐ Suspension effective beginning after release from incarceration. (17-A MRSA §1103, sub-§ 6.)

CR-1 Rev. 9/95                          **(OVER)**

☐ IT IS ORDERED THAT THE DEFENDANT FORFEIT AND PAY THE SUM OF _____
DOLLARS, AS A FINE, PLUS A 10% SURCHARGE, TO THE CLERK OF THE COURT. (4 M.R.S.A. § 1057)
IT IS FURTHER ORDERED THAT THE DEFENDANT PAY AN ADDITIONAL: ☐ $30.00   ☐ $125.00
SURCHARGE TO THE CLERK OF THE COURT. (29 M.R.S.A. § 1312-B(5), 29-A M.R.S.A. § 2411 (7))

☑ IT IS FURTHER ORDERED THAT THE DEFENDANT PAY AN ASSESSMENT OF $10.00 FOR EACH CLASS D
AND E CONVICTION AND $25.00 FOR EACH MURDER AND CLASS A, B, AND C CONVICTION FOR A TOTAL
OF $165.00 ~~WANED~~ TO THE CLERK OF THE COURT FOR THE VICTIMS' COMPENSATION FUND.
(5 M.R.S.A. § 3360-I)          $_____ OF THE ASSESSMENT HAS BEEN PAID.
☐ All but _____ suspended.
☐ Execution/payment stayed to pay in full by _____ or warrant to issue.
☐ To pay $_____ per week / month beginning _____ or warrant to issue.

☐ IT IS ORDERED THAT EXECUTION OF THE FOREGOING SENTENCE AS IT RELATES TO THE FINE BE
SUSPENDED AND THE DEFENDANT BE COMMITTED TO THE CUSTODY AND CONTROL OF THE DIVISION
OF PROBATION AND PAROLE FOR A TERM OF _____
UPON CONDITIONS ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN.

☐ IT IS ORDERED THAT THE DEFENDANT PERFORM _____ HOURS OF COMMUNITY SERVICE
WORK WITHIN _____ (WEEKS) (MONTHS) FOR THE BENEFIT OF _____

☑ IT IS ORDERED THAT THE DEFENDANT FORFEIT AND PAY THE SUM OF <sup>PRORATED</sup> MAXIUM OF $10,000.<sup>00</sup> ($1000.00/YR)
DOLLARS AS RESTITUTION, THROUGH THE (DIVISION OF PROBATION AND PAROLE) ~~(DISTRICT
ATTORNEY'S OFFICE)~~ FOR THE BENEFIT OF VICTIM / YEAR
**$1/000/YR DOES NOT APPLY TO THE 1ST YR OF PROBATION - TO START THE 2ND (17-A M.R.S.A. § 1152-2-A)
☑ Execution/payment stayed to pay ~~in full by~~ $1000/YR. or warrant to issue.

☐ IT IS ORDERED THAT THE DEFENDANT PAY _____FOR EACH DAY SERVED IN
THE COUNTY JAIL, TO THE TREASURER OF THE ABOVE NAMED COUNTY. (17-A M.R.S.A. § 1341)
☐ Execution/payment stayed to pay in full by _____ or warrant to issue.

☐ IT IS ORDERED THAT THE DEFENDANT SHALL PARTICIPATE IN ALCOHOL AND OTHER DRUG
EDUCATION, EVALUATION AND TREATMENT PROGRAMS FOR MULTIPLE OFFENDERS ADMINISTERED
BY THE DEPARTMENT OF HUMAN SERVICES. (29 M.R.S.A. § 1312-B (2)(D-1), 29-A M.R.S.A. § 2411 (5)(E))

☐ IT IS ORDERED THAT THE DEFENDANT FORFEIT TO THE STATE THE FIREARM USED BY THE
DEFENDANT DURING THE COMMISSION OF THE OFFENSE(S) SHOWN ABOVE. (17-A M.R.S.A. § 1158)

☐ IT IS ORDERED THAT THE DEFENDANT BE UNCONDITIONALLY DISCHARGED. (17-A M.R.S.A. § 1201)

IT IS FURTHER ORDERED THAT THE CLERK DELIVER A CERTIFIED COPY OF THIS JUDGMENT AND COMMITMENT TO
THE SHERIFF OF THE ABOVE NAMED COUNTY OR HIS AUTHORIZED REPRESENTATIVE AND THAT THE COPY SERVE AS
THE COMMITMENT OF THE DEFENDANT. REASONS FOR IMPOSING CONSECUTIVE SENTENCES ARE CONTAINED IN THE
COURT RECORD OR IN ATTACHMENTS HERETO.

A TRUE COPY, ATTEST: _____          _____
                      · Clerk, Superior Court                    Justice, Superior Court

I understand the sentence imposed herein and acknowledge receipt of a copy of this JUDGMENT AND COMMITMENT.

Dated: _____          _____
                                              Defendant

### RETURN
By virtue of the within JUDGMENT AND COMMITMENT I have this day delivered the within-named Defendant to the
_____

Dated: _____          _____
                                              Deputy Sheriff

By virtue of this warrant, the within-named Defendant has been removed to and received at the _____
_____ on this day.

Dated: _____          _____
                                              Authorized Officer/Supt., M.C.C./Warden M.S.P.

From:Federal Public Defender         To:913184737435         12/20/2010 17:34    #421 P.007/044

1                        SUMMARY OF TRANSCRIPT FILED

2

3       REPORTER:  Kathleen S. Casey

4       RCA:  Jeff Henthorn

5       CASE NAME:   State of Maine v. Jeremy Bender

6       DOCKET NO:  CR-96-1066

7       DATE OF PROCEEDING:  8-15-96

8       INDIGENT:  Yes ( )     No(X)

9       DATE OF APPEAL:

10      DATE OF FIRM ORDER:  May 7, 1999

11      PLACE FILED:  Clerk's Office

12      DATE FILED:  12-20-99

13      NUMBER OF PAGE:  62

15

16                          _S Bourget_              12-21-99

17                          Receiving Official            Date

18

19                       Please forward to:

20                       Jeff Henthorn, RCA
                         205 Newbury Street
21                          PO Box 328
                         Portland, ME 04112
22                          (207) 822-4176

23

24

Copy given

**1**

**STATE OF MAINE**                    **SUPERIOR COURT**
**YORK, SS**                               **CRIMINAL ACTION**
                                    CR-96-1066

**STATE OF MAINE**

         v.

**JEREMY BENDER,**
         Defendant

         **PROCEEDINGS**
                  (Sentencing)

**BEFORE:**

         HONORABLE LEIGH I SAUFLEY, JUSTICE OF
                  SUPERIOR COURT

         York County Courthouse
                  Alfred, Maine

         August 15, 1999

**APPEARANCES:**

   For the State: Jeffrey Moskowitz, ADA

   For the Defendant: Edwin P. Chester, Esquire

         Kathleen S. Casey, CSR
            Official Court Reporter

**2**

                  **PROCEEDINGS**
 2   (The following matter came on for hearing before
 3   the Honorable Leigh I. Saufley, Justice, at the
 4   Superior Court in Alfred, Maine, on August 15,
 5   1996.)
 6        MR. MOSKOWITZ:  There will be an
 7   amended, I am told by Mr. Chester that we have
 8   reached an agreement as to what we're going to
 9   be recommending to the court.
10        THE COURT:  I see.
11        MR. MOSKOWITZ:  Taking into
12   consideration the, what we discussed in
13   chambers.
14        THE COURT:  All right. Mr. Chester, are
15   you prepared to proceed?
16        MR. CHESTER:  Yes, judge.
17        THE COURT:  Step right up then Jeremy
18   Bender.
19        Let me make sure I have all the
20   documents I need. First let me note, for the
21   record, CR-96-1066, Mr. Bender is here with his
22   attorney, Mr. Chester.
23        I have before me an information
24   and this information contains nine separate
25   counts. Among those counts, the first five are

**3**

 1   felonies, the last four are misdemeanors.
 2        Mr. Bender, let me first ask you this
 3   question, sir; how old are you?
 4        THE DEFENDANT:  18.
 5        THE COURT:  And you have been bound over
 6   to the Superior Court after a proceeding in the
 7   District Court, is that right?
 8        THE DEFENDANT:  Yes, Your Honor.
 9        THE COURT:  And during that proceeding
10   you were represented by Mr. Chester?
11        THE DEFENDANT:  Yes.
12        THE COURT:  And you understand the
13   charges that have been filed against you?
14        THE DEFENDANT:  Yes.
15        THE COURT:  Have you read this
16   information?
17        THE DEFENDANT:  Yes.
18        THE COURT:  Do you understand each of
19   the charges in the information, Mr. Bender?
20        THE DEFENDANT:  Yes.
21        THE COURT:  Mr. Bender, are you sober
22   this morning?
23        THE DEFENDANT:  Yes.
24        THE COURT:  You look tired to me. Have
25   you had a bad week?

**4**

 1        THE DEFENDANT:  No, it was just
 2   medication that they have me on, it slows me
 3   down.
 4        THE COURT:  What is the medication?
 5        THE DEFENDANT:  Gladene (phonetic).
 6        THE COURT:  And what is it prescribed
 7   for?
 8        THE DEFENDANT:  To slow me down.
 9        THE COURT:  To slow you down?
10        THE DEFENDANT:  Yeah.
11        THE COURT:  And do you perceive it to be
12   slowing you down?
13        THE DEFENDANT:  Yeah.
14        THE COURT:  Yes?
15        THE DEFENDANT:  Yes.
16        THE COURT:  How long have you been on
17   this medication?
18        THE DEFENDANT:  Six months.
19        THE COURT:  Does it interfere with your
20   ability to understand things?
21        THE DEFENDANT:  No.
22        THE COURT:  Does it cause you any
23   difficulty in perceiving what is going on around
24   you?
25        THE DEFENDANT:  No.

5

1    THE COURT: And you have been on it long
2    enough now so you understand its effects on you?
3        THE DEFENDANT: Yes.
4        THE COURT: Mr. Chester, you have been
5    working with Mr. Bender throughout this period
6    of medication and I understand there have been
7    other medications that he has at least attempted
8    to assist him with some of his issues in the
9    past; have you found that in the last six months
10   you have had any difficulty communicating with
11   him?
12       MR. CHESTER: No, judge, and we have
13   spent a significant amount of time this morning
14   discussing this -- these issues and the changes
15   and the plea offers and agreements and my
16   discussions with the district attorney and based
17   on the responses that Jeremy has made to my
18   questions and suggestions I believe that he
19   understands the nature of these proceedings and
20   the nature of my negotiations and understanding
21   with the district attorney.
22       THE COURT: All right, thank you, Mr.
23   Chester. Mr. Bender, do you agree with Mr.
24   Chester that you understand what is happening
25   here this morning?

6

1    THE DEFENDANT: Yes.
2        THE COURT: And you feel comfortable
3    going forward? You know this is a very serious
4    event that your attorney tells me you are about
5    to enter pleas of guilty to each of these nine
6    counts, is that your intention?
7        THE DEFENDANT: Yes.
8        THE COURT: You do understand if you
9    enter these pleas today and I sentence you today
10   this will be your final time in court, assuming
11   that there are no problems during the
12   probationary period, with regard to these
13   charges; you are very clear that this is it?
14       THE DEFENDANT: Yes.
15       THE COURT: And you are ready to go
16   forward?
17       THE DEFENDANT: Yes.
18       THE COURT: All right. Let me just
19   explain to you then that with regard to these
20   charges you have a right to have them presented
21   to the grand jury, grand jury would have
22   reviewed the charges and determined whether or
23   not the charges should have been brought. In
24   this case the State has presented the charges
25   through an information, which means they have

7

1    never gone through a grand jury process, they
2    have come directly to the court, do you
3    understand that?
4        THE DEFENDANT: Yes.
5        THE COURT: It's my understanding this
6    has been done in part at the request of your
7    attorney because as of right now you are not
8    receiving credit for the time that you are
9    incarcerated, is that correct, Mr. Chester?
10       MR. CHESTER: That is my understanding
11   of the law, Your Honor.
12       THE COURT: All right. And, Mr. Bender,
13   you understand that before you can proceed this
14   morning, before I can act on this information, I
15   need to determine whether you want to approve
16   this going forward by an information or whether
17   you wish to have the grand jury screen these
18   charges against you, do you understand that,
19   sir?
20       THE DEFENDANT: Yes.
21       THE COURT: Do you want to proceed here
22   this morning?
23       THE DEFENDANT: Yes.
24       THE COURT: Do you wish to waive your
25   right to have the matters presented to the grand

8

1    jury?
2        THE DEFENDANT: Yes.
3        THE COURT: All right, I am going to
4    give you a document, this is a waiver, I want
5    you to go over that with Mr. Chester, make sure
6    you understand it thoroughly. Take your time.
7        Thank you. Now, Mr. Bender, this
8    is your signature?
9        THE DEFENDANT: Yes.
10       THE COURT: And, Mr. Chester, I saw you
11   sign --
12       MR. CHESTER: Yes, judge.
13       THE COURT: And neither of you have any
14   hesitation about proceeding here this morning?
15       MR. CHESTER: No, Your Honor.
16       THE COURT: All right. The Court's
17   approval has been given. Do counsel agree, I
18   don't think we ever actually discussed this,
19   it's my understanding if Jeremy Bender in fact
20   pleads guilty to each of these charges and if I
21   accept the plea agreement that counsel for both
22   the State and the Defendant have agreed to the
23   sentence that would be imposed, there's no
24   longer an issue about which both parties wish to
25   argue, is that now correct?

**9**

1    MR. MOSKOWITZ:  That is what I
2  understand, Your Honor.
3    MR. CHESTER:  Yes, judge.
4    THE COURT:  Mr. Chester, and I should
5  probably make it clear for the record that in
6  advance of this proceeding here today counsel
7  provided me with psychological evaluations, two
8  of them with regard to Mr. Bender, that I have
9  discussed the matters with counsel and that I
10  have indicated some concerns earlier about the
11  length of a second sentence the State was going
12  to be recommending.  We had quite a free-ranging
13  discussion about the purposes of sentencing in a
14  case such as this which is relatively unusual
15  and I understand that counsel have now reached
16  an agreement.  I am going to assume, counsel,
17  since there's nothing indicated otherwise in the
18  record, that the maximum on the Class A's
19  charged against Mr. Bender at any rate in this
20  case would be no greater than 20 years, is that
21  correct?
22    MR. MOSKOWITZ:  Yes, Your Honor.
23    THE COURT:  State would not be arguing
24  this as a 40-year case?
25    MR. MOSKOWITZ:  No.

**10**

1    THE COURT:  You understand why I am
2  talking to the attorneys about these things, Mr.
3  Bender?
4    MR. CHESTER:  Yeah.
5    THE DEFENDANT:  Yes.
6    THE COURT:  You have a question there?
7  I see you checking with Mr. Chester.  And I want
8  to make sure you feel free --
9    THE DEFENDANT:  No, I just didn't
10  understand the question.
11    THE COURT:  In the event you are
12  convicted of a Class A crime and the judge
13  sentences you without a plea agreement before
14  the judge, some Class A crimes carry the
15  possibility of a jail sentence of up to 40
16  years, rather than in your case up to 20 years
17  and it's important to me to know before we begin
18  the sentencing which range of cases your crimes
19  or these allegations fall in so I check with
20  counsel to make sure nobody is saying to me
21  today that these are 40-year offenses, these --
22  those would be the most serious of the Class A
23  offenses, all right?
24    THE DEFENDANT: All right.
25    THE COURT:  But I don't want you to be

**11**

1  confused.  First the charges Count I and II are
2  robbery, Class A charges, and they both do carry
3  with them the possibility of a jail sentence of
4  up to 20 years in jail; you understand that?
5    THE DEFENDANT:  Yes.
6    THE COURT:  The Class B offenses carry
7  the possibility of a sentence of up to ten
8  years; the Class C up to five years, and then
9  there are I think four misdemeanors.  Let me
10  make sure I am clear on that.  The last four
11  charges are misdemeanors.  One is a Class E and
12  the sentence on that may be up to six months,
13  and the last three are Class D's, the sentence
14  may be up to a day short of a year; do you
15  understand the sentencing possibilities on these
16  charges?
17    THE DEFENDANT:  Yes.
18    MR. MOSKOWITZ:  Excuse me, if I could
19  interject, Count II, that is a typographic
20  error, it's a Class B offense, shouldn't be
21  listed as a Class A.
22    THE COURT:  State moves to amend the
23  typo, and no objection?
24    MR. CHESTER:  That is correct.
25    THE COURT:  So this should be a Class B

**12**

1  and I will grant the motion to amend.
2    MR. MOSKOWITZ:  And also, Your Honor, on
3  Count III there would be a minimum mandatory
4  period of incarceration on Count III, which
5  would be a minimum mandatory period of one year.
6    THE COURT:  All right, let me just take
7  a look.  Count III alleges the use of a handgun
8  and, therefore, with all allegations in Count
9  III a minimum mandatory sentence of at least a
10  year would have to be imposed on that count, you
11  understand that, Mr. Bender?
12    THE DEFENDANT:  Yes.
13    THE COURT:  You understand now that
14  Count II is not a Class A charge, it's a Class B
15  charge but carries a possibility of a sentence
16  up to ten years?
17    THE DEFENDANT:  Yes.
18    THE COURT:  You are clear on that?
19    THE DEFENDANT:  Yes.
20    THE COURT:  All right.  Count II does
21  not allege -- there's an intent to use force?
22    MR. MOSKOWITZ:  A threat to use force,
23  yes, Your Honor.
24    THE COURT:  And Count I alleges actual
25  use of a dangerous weapon, that is the stick?

13

1    MR. MOSKOWITZ:  That is correct.
2    THE COURT:  All right. Now Count IV is
3  a Class B burglary and alleges a burglary into a
4  dwelling place. Count V is a charge of escape,
5  that is the Class C. All right, Mr. Bender,
6  going through all of these relatively rapidly,
7  if you have any question about any of these
8  charges, I am going to suggest, again, that you
9  stop me and you feel free to talk to Mr.
10 Chester. It's also, and the record should
11 probably reflect this, you are working with Mr.
12 Chester with regard to charges that are now
13 pending in Cumberland County, is that right?
14    THE DEFENDANT: Yes.
15    THE COURT:  And those charges are going
16 to be addressed sometime within the next month?
17    MR. CHESTER:  I would hope so, judge.
18    THE COURT:  You are still working on the
19 issues.
20    MR. CHESTER:  Well, I think we have an
21 agreement. The question is when they will
22 actually come before the court.
23    THE COURT:  All right. Do those charges
24 because of Mr. Bender's situation carry the same
25 problem, that is that he will not get credit for

14

1  time that he is serving now?
2    MR. CHESTER:  Yes.
3    MR. MOSKOWITZ:  But he's not been bound
4  over to date, Your Honor, on those matters.
5  They are still juvenile charges right now.
6    THE COURT:  In the juvenile court?
7    MR. MOSKOWITZ:  That is right.
8    MR. CHESTER:  That is right.
9    THE COURT:  Do you anticipate proceeding
10 in the juvenile court on those charges?
11    MR. CHESTER:  Well I think we'll have an
12 agreement by which any sentence imposed there
13 will be served concurrently to the sentence
14 imposed here.
15    THE COURT:  All right, the sentence,
16 however, is anticipated to be slightly longer?
17    MR. CHESTER:  Yes, that is correct.
18    THE COURT:  All right. Mr. Bender, you
19 understand everything so far?
20    THE DEFENDANT: Yes.
21    THE COURT:  Let me just explain to you
22 if you plead guilty to these charges, to all of
23 these charges, on any one of these charges you
24 have a right to have a trial. If you plead
25 guilty you give up that right forever, do you

15

1  understand that, Mr. Bender?
2    THE DEFENDANT: Yes.
3    THE COURT:  And with that right you give
4  up your right to have a speedy and public trial
5  by a judge or a jury. You give up your right to
6  present witnesses on your own behalf. You give
7  up your right to have Mr. Chester confront and
8  cross-examine the witnesses presented by the
9  State, you understand that?
10    THE DEFENDANT: Yes.
11    THE COURT:  You will also give up your
12 right to testify yourself as to any one of these
13 charges; however, even if you asked for a trial
14 you would never give up your right to remain
15 silent. What that means is if you chose to have
16 a trial on any or all of these charges you could
17 not be required to testify. And if you did not
18 testify a court would instruct a jury that that
19 could not be held against you, do you understand
20 that?
21    THE DEFENDANT: Yes.
22    THE COURT:  You understand that on each
23 one of these charges separately and individually
24 the State would have to prove each element of
25 the charge beyond a reasonable doubt to a

16

1  unanimous jury, you understand that, Mr. Bender?
2    THE DEFENDANT: Yes.
3    THE COURT:  Now you have talked with Mr.
4  Chester about all of these rights?
5    THE DEFENDANT: Yes.
6    THE COURT:  And you are clear that you
7  understand what you are giving up here today?
8  Mr. Chester I assume, given the way this matter
9  is before the court, there have been no pretrial
10 motions after the bindover hearing.
11    MR. CHESTER:  That is correct.
12    THE COURT:  And you are confident that
13 that process is not necessary under the
14 circumstances?
15    MR. CHESTER:  Yes, judge.
16    THE COURT:  You have received discovery
17 and have had a full opportunity to review
18 discovery?
19    MR. CHESTER:  It's voluminous, judge, and
20 we have had an opportunity to review it.
21    THE COURT:  And all of that was
22 available during the bindover process?
23    MR. CHESTER:  Yes.
24    THE COURT:  None of this was a surprise?
25    MR. CHESTER:  No.

**17**

1  THE COURT: Go through each one of these
2  charges and make sure you understand the
3  elements of the charges and what the State would
4  have to prove. Now I see that this is not
5  something you are happy to be going through,
6  it's necessary for me to make sure you
7  understand what you are doing. If you have any
8  questions, stop me, all right?
9  THE DEFENDANT: Yes.
10  THE COURT: The first charge, Count I,
11  is a charge of robbery, it is Class A, that is
12  the one that carries the 20 year possible
13  sentence. In that count the State would have to
14  prove beyond a reasonable doubt that in fact you
15  committed or attempted to commit theft by
16  obtaining or exercising unauthorized control
17  over the property of another person, in this
18  case Mary Gorduris (phonetic), and specifically
19  in this case the State alleges that the property
20  was a pocketbook and its contents, that you
21  intended to deprive her of that pocketbook and
22  its contents and that you were armed with a
23  dangerous weapon, specifically, a four-foot-long
24  stick during the course of the robbery. Do you
25  understand those elements?

**18**

1  THE DEFENDANT: Yes.
2  THE COURT: With regard to Count II the
3  State would have to prove once again that you
4  did commit or attempt to commit theft by
5  obtaining or exercising unauthorized control
6  over the property of the Normandy Motel,
7  specifically U.S. currency, that you intended to
8  deprive the motel of that currency, that you
9  threatened to use force against a person at the
10  time you attempted to commit the theft,
11  specifically Michael Buford (phonetic), and that
12  you intended to compel that person who had
13  control of the property to give it up to you or
14  to engage in conduct which aids in the taking or
15  carrying away of the property. Now those are
16  the elements. You have discussed those with Mr.
17  Chester?
18  THE DEFENDANT: Yes.
19  THE COURT: You understand essentially
20  what it is the State would have to prove?
21  THE DEFENDANT: Yes.
22  THE COURT: The third count is a charge
23  of reckless conduct with a firearm, it is the
24  Class C offense, and in that count the State
25  would have to prove that you did use a firearm

**19**

1  against a person and in so doing recklessly
2  created a substantial risk of serious bodily
3  injury to that person or persons, in this case
4  the State alleges Ed Greenleaf or Ricky Eli, by
5  firing a nine millimeter handgun in the
6  direction of a motor vehicle and residences at
7  the Five Points intersection; you understand
8  those elements, sir?
9  THE DEFENDANT: Yes.
10  THE COURT: There is then a burglary
11  count in Count IV is a Class B offense. And in
12  that charge the State would have to have proved
13  that you entered or surreptitiously remained in
14  a structure, that the structure was in fact a
15  dwelling place. In this case the State alleges
16  the dwelling place of Norman Caren, that you
17  knew you were not licensed or privileged to be
18  in that structure, and that you were there with
19  the intent to commit the crime of theft. Do
20  you understand those elements, sir?
21  THE DEFENDANT: Yes.
22  THE COURT: With regard to the escape
23  charge the State would have to prove that you
24  did intentionally leave the official custody of
25  the Maine Youth Center, that you did so without

**20**

1  official permission, that you were there
2  pursuant to a juvenile disposition for a
3  juvenile crime that had been imposed by the
4  district court, specifically the Lewiston
5  District Court; do you understand those
6  elements?
7  THE DEFENDANT: Yes.
8  THE COURT: All right, now with regard
9  to the last four charges you are charged with
10  criminal trespass on all four charges. In each
11  of those charges the State would have to prove
12  that you, knowing you were not licensed or
13  privileged to enter a structure, entered that
14  structure, which was locked or barred, and in
15  this, in the four counts the State alleges first
16  that you entered a structure, which was the Twin
17  City Market. In Count VII the State alleges
18  that you entered the dwelling place of Timothy
19  Roberge and Scott Bolier. In Count VIII the
20  State alleges that you entered the dwelling
21  place of Diane and Charles Turgin, and in Count
22  IX the State alleges that you entered the
23  dwelling place of Ronald Lapoint. Do you
24  understand the elements of a criminal trespass
25  charge?

from:Federal Public Defender          To:913184737435          12/20/2010 17:36     #421 P.013/044

21

1    THE DEFENDANT: Yes.
2         THE COURT:  That is that the structure
3    was locked or barred and that you had no license
4    or privilege to be in it, you understand that?
5    THE DEFENDANT: Yes.
6         THE COURT:  All right. Are there any of
7    those charges that you do not understand, Mr.
8    Bender?
9    THE DEFENDANT: No.
10        THE COURT:  And you are clear that you
11   understand that the State would have to have
12   proved each element of any one of those charges
13   before there could be a conviction against you
14   on that charge?
15   THE DEFENDANT: Yes.
16        THE COURT:  Additionally the State would
17   have to prove those elements beyond a reasonable
18   doubt to a unanimous jury. Very clear on all
19   these things?
20   THE DEFENDANT: Yes.
21        THE COURT:  Mr. Bender, have you ever
22   appeared in the Superior Court before?
23   THE DEFENDANT: No.
24        THE COURT:  This is your first
25   appearance in this court?

22

1    THE DEFENDANT: Yes.
2         THE COURT:  You have been in juvenile
3    court before?
4    THE DEFENDANT: Yes.
5         THE COURT:  And you have never been
6    through -- now you question that?
7    THE DEFENDANT: No, I was here two days
8    ago, does that count?
9    MR. CHESTER:  Yes.
10        THE COURT:  It sort of counts. We
11   didn't, as I recall, go through any particular
12   process. You were here and the matter was set
13   over. All right, before I hear from the State
14   with regard to what would have been presented if
15   these matters were to go to trial, Mr. Bender, I
16   want to make sure you are entering into this
17   plea here today voluntarily. Do you know what I
18   mean by voluntarily?
19   THE DEFENDANT: Yes.
20        THE COURT:  Are you doing this of your
21   own free will?
22   THE DEFENDANT: Yes.
23        THE COURT:  Has anyone pressured you
24   into entering a plea here today?
25   THE DEFENDANT: No.

23

1         THE COURT:  Has anyone threatened you in
2    order to get you to plead guilty and give up
3    your rights?
4    THE DEFENDANT: No.
5         THE COURT:  Has anyone promised you
6    anything in exchange for this plea of guilty
7    with the exception of the plea agreement that I
8    will hear from the attorneys in just a moment?
9    THE DEFENDANT: No.
10        THE COURT:  All right, I am going to ask
11   you to listen very carefully to what Mr.
12   Moskowitz is about to tell me about what would
13   have been presented if these charges were to go
14   to trial.
15   MR. MOSKOWITZ:  Thank you, Your Honor.
16   With respect to Count I, on September 13th,
17   1995, a woman named Mary Gorduris, who lives in
18   Saco, heard a knock on her door. Miss Gorduris
19   is seventy five years old. Thinking that her
20   sister Mini was at the door she started to open
21   it and saw a tall male person standing there
22   with a stick in his hand, the stick was about
23   four feet long or thereabouts. This person is
24   the Defendant who stands before you who Miss
25   Gorduris tried to close the door but Mr. Bender

24

1    put his foot in the door and pushed it open.
2    When he entered the house he held the stick up
3    across his chest and was pushing it at Miss
4    Gorduris causing her to fall backward into the
5    house. He told her he wanted her money. She
6    indicated she just had her pocketbook. He did
7    not assault Miss Gorduris but he told her at
8    that time to get the pocketbook or he would let
9    her have it, those were the words he used, let
10   her have it, indicating that with the stick he
11   was holding. He then followed her into the
12   kitchen where her pocketbook was located. She
13   then handed him that pocketbook and he left.
14   He was accompanied at that time by another
15   juvenile name Geoffrey Nasianti (phonetic), who
16   also was charged with that offense.
17        As to Count II, on September 22nd,
18   1995, a person named Michael Buford was working
19   at the Normandy Motel as night manager. At
20   approximately 11:00 o'clock that evening Mr.
21   Bender entered the lobby of the motel and asked
22   Mr. Buford to change a ten dollar bill into two
23   five dollar bills. Mr. Buford then went into
24   the back room, which is about five to six feet
25   from the counter where Mr. Bender was standing,

25

1  Mr. Buford started to open the register and then
2  he heard Mr. Bender say excuse me, sir, but I
3  want all your money. Mr. Buford then turned
4  toward Mr. Bender and noticed that Mr. Bender
5  had a gun pointed at him. Mr. Buford described
6  the gun as a small automatic weapon. Mr. Buford
7  refused to give the money to Mr. Bender and
8  essentially told him to get out of the motel.
9  He then looked to the left, toward what was
10 actually nobody but he hoped that Mr. Bender
11 would assume there was another person in the
12 next room and said call the police right now.
13 Mr. Buford was actually the only one in the
14 office. Mr. Bender then pulled the slide back
15 on the gun he was holding and said if you don't
16 give me your money I will shoot you. Then Mr.
17 Buford said well then go ahead and shoot me, and
18 reached for a can of Lysol which was located
19 next to where he was located and began to throw
20 it at Mr. Bender. At that point Mr. Bender then
21 turn and ran out the door. He was observed
22 getting into an automobile and fled the scene.
23      With respect to Count III, Your Honor, on
24 September 18th, 1995, Mr. Bender and a person
25 named Michael Zelensky were on Mr. Zelensky's

26

1  porch at his residence in Biddeford. Four
2  individuals pulled into the yard in a Chevrolet
3  Corsica automobile. When they got out of the
4  car they assaulted Mr. Bender. That was
5  essentially surrounding, about a situation where
6  Mr. Bender had allegedly taken a handgun from
7  them earlier. Mr. Bender also allegedly owed
8  him some money. There was a shoving match that
9  took place and verbal fight also took place. At
10 some point in time the individuals got back into
11 their car and started driving away from the
12 area. As they began driving away from the area
13 they, the individuals began pulling out firearms
14 or at least it appeared they began pulling out
15 some firearms. Meanwhile Mr. Bender pulled out
16 a nine millimeter handgun and fired a shot into
17 the air over the heads of the four individuals.
18 Mr. Zelensky and Mr. Bender and a person named
19 Jameson Sneider who was also at the scene jumped
20 into Mr. Solinski's car and chased after the
21 other four individuals down the street. When
22 they got to the area of the Five Points
23 intersection near the McDonalds restaurant, near
24 that intersection the four people in the lead
25 car jumped out and started running away. At

27

1  that point they were still being chased by Mr.
2  Zelensky, Mr. Sneider and Mr. Bender in Mr.
3  Solinski's car. At that point Mr. Bender took
4  out the nine millimeter handgun and started
5  firing shots towards these individuals and one
6  of the bullets from that nine millimeter handgun
7  ended up lodging in an automobile radiator of a
8  truck that was at the intersection being driven
9  by a person named Mr. Greenleaf. One of the
10 other bullets was later found lodged in a
11 residence located in that area, that residence
12 being owned by a person named Ricky Eli.
13      As to Count IV, on September
14 15th, 1995, a person named Norman Caren who
15 lives in Saco reported that a burglary and a
16 theft had taken place at his residence involving
17 a safe and forty thousand dollars in currency.
18 It was learned at that time through
19 investigation that the police engaged in that a
20 person named Mario Hale was driving a truck
21 owned by a James Sacuso (phonetic). These were
22 all friends of Mr. Bender. Mr. Bender was also
23 present at that time. Mr. Hale driving the
24 truck parked at a location in Saco known as
25 Bob's Exxon which is located on Route 1. Mr.

28

1  Bender and a person named Geoffrey Nosmiento
2  (phonetic) got out of the truck at that time and
3  were gone for approximately a half hour to 45
4  minutes. They returned to the truck with what
5  appeared to Mr. Hale to be a safe that was
6  loaded on to the truck and Mr. Hale drove Mr.
7  Bender and Mr. Nasmiento and Mr. Sacuso to a
8  place called Diamond Park in Saco. When they
9  got to Diamond Park Mr. Bender, Mr. Nasmiento
10 and Mr. Sacuso removed the safe from the truck,
11 brought it into the park and during the darkness
12 hours of that day, the 15th of September, they
13 ended up breaking into the safe and removing its
14 contents which included 40 thousand dollars in
15 U.S. currency.
16      With respect to Count V, on May
17 26th, 1995, Detective Davis of the Biddeford
18 Police Department was travelling on Elm Street
19 in Biddeford and he saw two people walking
20 southbound on Elm Street. Detective Davis
21 recognized one of the people as Jeremy Bender
22 who he knew very, very well and he also knew Mr.
23 Bender to be absent without leave from the Maine
24 Youth Center. Mr. — or Detective Davis chased
25 after Mr. Bender. A brief chase occurred and

29

1  Mr. Bender was apprehended. And Mr. Bender had
2  been in the Youth Center pursuant to a
3  sentence — I am sorry, a disposition from the
4  Maine — from the Lewiston District Court
5  sitting as the juvenile court and was actually,
6  the disposition of that at that time was that
7  Mr. Bender be sent to the Maine Youth Center.
8  On May 26, 1995, he was absent without leave and
9  at that time Detective Davis presented him in
10 Biddeford.
11      THE COURT:  Mr. Chester, I am going to
12 ask you once again to make sure that the
13 discovery that you have been provided comports
14 with what you have just heard from the State
15 here today?
16      MR. CHESTER:  Yes, Your Honor.
17      THE COURT:  And your confident that you
18 received all of the discovery that was due the
19 Defendant under these circumstances even though
20 this has been a somewhat abbreviated process?
21      MR. CHESTER:  Yes, Your Honor.
22      THE COURT:  Have you had a chance to
23 review the discovery with your attorney?
24      THE DEFENDANT:  Yes.
25      THE COURT:  Now that you have heard from

30

1  Mr. Moskowitz, do you have any substantial
2  disagreement with anything that I have just
3  heard from the State?
4      THE DEFENDANT:  No, Your Honor.
5      THE COURT:  Mr. Bender, are you pleading
6  guilty to these charges because you are guilty
7  and for no other reason?
8      THE DEFENDANT:  Yes.
9      THE COURT:  Are you confident in the
10 services that Mr. Chester has provided to you?
11      THE DEFENDANT:  Yes.
12      THE COURT:  Do you feel you have had
13 enough time to talk with him about all of these
14 charges and the other matters that you are
15 dealing with right now?
16      THE DEFENDANT:  Yes.
17      THE COURT:  And has Mr. Chester assisted
18 you through the bindover process previously?
19      THE DEFENDANT:  Yes.
20      THE COURT:  Do you think he's given you
21 good advice during this process?
22      THE DEFENDANT:  Yes.
23      THE COURT:  Do you have any complaints
24 that you want to make about your situation with
25 your attorney?

31

1      THE DEFENDANT:  No.
2      THE COURT:  Mr. Chester, you have
3  indicated that you have been involved in this
4  matter for quite a time now and you have had
5  quite a bit of involvement, in fact, the
6  bindover hearing took how long?
7      MR. CHESTER:  It was a three day
8  hearing, judge.
9      THE COURT:  And that was in which of the
10 district courts?
11      MR. CHESTER:  Biddeford.
12      THE COURT:  In the Biddeford District
13 Court. And during that time you had ample
14 opportunity to meet with and talk with Jeremy
15 Bender about the matters pending?
16      MR. CHESTER:  Yes, Your Honor.
17      THE COURT:  Do you feel you and he have
18 had a good client/attorney relationship?
19      THE DEFENDANT:  Yes.
20      THE COURT:  Any reason I shouldn't
21 accept this plea today?
22      MR. CHESTER:  No, Your Honor.
23      THE COURT:  Is there a plea agreement?
24      MR. MOSKOWITZ:  Yes, Your Honor, and
25 after we had discussions in chambers Mr. Chester

32

1  and I have essentially agreed on the
2  recommendation to the court. It calls for the
3  following sentence:  With respect to Count I,
4  the recommendation is for six years to the
5  Department of Corrections, with all but two
6  years suspended, followed by six years of
7  probation. With respect to Count II, the
8  recommendation is for four years to the
9  Department of Corrections, all suspended,
10 followed by four years of probation. And Count
11 II would run consecutive to Count I. With
12 regard to Count III, the recommendation is for
13 two years to the Department of Corrections,
14 concurrent with Count I. As to Count IV, 12
15 months to the Department of Corrections
16 concurrent with Count I. As to Count V, three
17 hundred sixty four days to the Department of
18 Corrections concurrent with Count I. And as to
19 Counts VI through IX, the recommendation would
20 be for six months to the county jail concurrent
21 with Count I. There would be essentially seven
22 special conditions of probation that we would be
23 requesting, Your Honor. They are as follows:
24 First, that Mr. Bender will reside and be
25 treated in the Day One program or its equivalent

33

1   for the first year of probation. He will also
2   agree to execute the appropriate necessary
3   releases so that the Probation Department may
4   obtain relevant records. Second, that Mr.
5   Bender will engage in substance abuse treatment
6   and counseling to the satisfaction of division
7   of Probation and Parole. And, again, he will
8   agree to execute all appropriate necessary
9   releases. With respect to Count III, there
10  would be a requirement of no possession or
11  consumption of any alcohol at all or any illegal
12  drugs that aren't prescribed. With regard to
13  Count IV, there would be random searches and
14  testing of Jeremy's person, place of residence
15  and motor vehicle for any alcohol and illegal
16  drugs. The fifth condition would be that Mr.
17  Bender receive psychological counseling and
18  treatment to the satisfaction of division of
19  Probation and Parole and again he will agree to
20  execute all appropriate releases.
21       THE COURT: That is a separate
22  counseling separate from the substance abuse
23  issues?
24       MR. MOSKOWITZ: Yes, Your Honor,
25  psychological treatment, that is right. Six,

34

1   that he would have no contact direct or indirect
2   with either Jameson Sneider or Michael Zelensky.
3       THE COURT: Could you spell Zelensky?
4       MR. MOSKOWITZ: Yes, Your Honor.
5   Z-e-l-e-n-s-k-y.
6       THE COURT: Thank you.
7       MR. MOSKOWITZ: And, finally, Your
8   Honor, that Mr. Bender would pay restitution
9   prorated among all the victims where appropriate
10  in the amount, in the maximum amount of ten
11  thousand dollars by the end of the probationary
12  period. That amounts to roughly one thousand
13  dollars per year.
14       THE COURT: Before I hear from Mr.
15  Chester with regard to the recommended sentence,
16  just a couple of questions. First, Count II is
17  intended by both parties to run consecutive to
18  Count I, all other counts will run, I am sorry,
19  will run concurrent with Count I, the intention
20  of the parties there being that there will be a
21  ten year period of probation, that there will be
22  underlying that ten year period for the first
23  period the remainder of the six years which will
24  be the four years left on that and then the
25  second four year period. And I would like to

35

1   hear from the State at this point as to the
2   reason for the request for the consecutive
3   sentence on Count II.
4       MR. MOSKOWITZ: Sure, Your Honor. The
5   reason for the request for consecutive
6   sentencing is, number one, it's the State's view
7   that under Section 1256, subsection, the
8   subsections A, B and D, that Mr. −, that a
9   consecutive sentence is appropriate. Again
10  those, that statute addresses circumstances
11  where consecutive sentences are appropriate.
12  The three subsections that I referred to that
13  actually apply in this case are that Counts I
14  and II are entirely different criminal episodes,
15  *they didn't happen on the same day, didn't*
16  happen in the same area. The second, the second
17  factor is that Mr. Bender was on a release
18  program during the time that these crimes were
19  committed, specifically he was on leave from the
20  Maine Youth Center. And the third criteria
21  which is present in this situation which makes
22  consecutive sentencing appropriate is that the
23  seriousness of the conduct that Mr. Bender
24  engaged in over this period of time requires a
25  sentence in excess of the maximum sentence

36

1   available for the most serious offense. Playing
2   into that, Your Honor, it's the State's view
3   that after reading Dr. Kerr's (phonetic)
4   evafuation and Dr. Carbon's (phonetic)
5   evaluation that Mr. Bender has some significant
6   difficulties, including substance abuse and
7   psychological problems which will require a
8   large amount of intervention, and it's, although
9   there is no magic formula to determine how long
10  Mr. Bender will need to address his problems,
11  it's the State's view that based on those
12  reports and based on the history in those
13  reports about Mr. Bender that more than six
14  years of probation is appropriate. And that is
15  *why the State is recommending the consecutive*
16  sentence with respect to Count I and II. It's
17  the State's view, Your Honor, just as a personal
18  observation, that this is one of the few cases
19  that come before the court where, where
20  probation can actually, it's the State's view
21  can actually make a major difference in the life
22  of a person. We have a very young person here,
23  who has really never been involved in a
24  situation where he was forced by way of where he
25  was motivated properly to address the issues

37

1  that he has a problem with.  The situation that
2  will result from this sentence will create in
3  the State's view a substantial motivating factor
4  for Mr. Bender to engage in the treatment that
5  he needs to address his problems, because if he
6  doesn't, he is facing going back to prison for
7  four years.  After reading Dr. Kerr's report
8  it's pretty apparent that this is not going to
9  be a very easy thing for Mr. Bender to do.  It's
10 going to be tough, going to take a lot of
11 courage on Mr. Binder's part to address these
12 problems but if he has the courage to do that,
13 this is one of the few cases where probation can
14 actually matter and actually help somebody.  And
15 it's the State's view that the ten years of
16 probation is something that ought to be imposed.
17     THE COURT:  Thank you.  Mr. Chester, is
18 this your understanding of the plea agreement?
19     MR. CHESTER:  Yes, it is, judge.
20     THE COURT:  Do you want to add anything
21 to the record?
22     MR. CHESTER:  Um, I guess, Your Honor, I
23 would like to say a few words about Jeremy.  We
24 have an agreement now and so I don't think it's
25 necessary to go into all of the detail that I

38

1  had originally wanted to but I think it's
2  important for the Court to understand that we
3  recognize that what happened here was these were
4  horrible offenses and the behavior was really
5  unexcusable and Jeremy understands that and is
6  willing to take the responsibility for that.
7  What we're dealing with here, however, is not a
8  raging sociopath but a young man who suffers
9  from depression and has suffered from depression
10 probably for ten or 12 years which resulted from
11 some of the horrible things that happened to him
12 when he was small.  He also suffers from a very
13 serious substance abuse and addiction problem.
14 I think while these crimes are horrible and
15 inexcusable, if you look at what actually
16 occurred, what you had was a young man who was
17 trying to get money for drugs.  In both of
18 these serious robbery situations there was
19 tremendous potential for violence, for random
20 and unnecessary violence, and in each case this
21 young man pulled back.  Now that is not offered
22 as a defense but if you were dealing with a real
23 sociopath somebody could have been hurt and
24 somebody probably would have been hurt and at a
25 time when this young man was ingesting crack

39

1  cocaine and PCP on an almost hourly basis.  Two
2  of the most disinhibiting drugs that we know of.
3  He didn't engage in that kind of senseless
4  violence and I think, again, we're not excusing
5  the conduct but I think there is a reflection of
6  the character of this young man that he is not a
7  raging sociopath, that what was going on was
8  really a reflection of the depression and the
9  addiction.  In terms of the firing of the gun
10 at Five Points in Biddeford, again, it's
11 inexcusable conduct and certainly people could
12 have been hurt.  That was the result of an
13 argument with four drug dealers who had pulled a
14 gun on Jeremy, who had engaged in an assault on
15 Jeremy, and frankly, judge, I think you probably
16 know these individuals from perhaps your earlier
17 days in district court.  Charlie Jones, Latef
18 Palay (phonetic), Tony Osborn, and Michael
19 Parker, all of whom are, certainly don't deserve
20 to be shot at but are characters who would
21 inspire that kind of anger and rage particularly
22 in a young man who was seriously addicted to
23 some very powerful substances.  The purposes of
24 sentencing that I think the court should address
25 are, one, the issue of punishment and, second,

40

1  the issue of deterrence.  It's my position that
2  Jeremy has already been punished substantially,
3  not necessarily in connection with these crimes
4  but if you consider the young man went to the
5  Maine Youth Center on a criminal mischief
6  misdemeanor charge in 1991 and was there for
7  five years, and that five year period the
8  only — there was never any kind of an
9  evaluation, nobody ever identified the issue of
10 depression, nobody ever did a psychological
11 evaluation.  The only evidence in the record at
12 that, the Youth Center identified any problem
13 with this young man was the problem of drug and
14 alcohol addiction.  They identified that the
15 month he came into the Youth Center.  They
16 identified it throughout his stay and throughout
17 his stay not a single aspect of substance abuse
18 treatment was offered to Jeremy even though they
19 have a full cottage that is dedicated to nothing
20 else over there.  Again, I am not offering this
21 as an excuse but I think the State has obtained
22 a pound flesh from Jeremy here.  He spent most
23 of his time locked up for everything from making
24 animal noises to escape.  And, again, I am not
25 going to belabor the record as I was prepared to

41

1  do but I think it's important for the court to
2  just understand one little set of incident. He
3  was originally released after two years to his
4  family in Lewiston and a tracker followed him,
5  and this was somebody he checked in with every
6  day, somebody who was both support and
7  monitoring for Jeremy and Jeremy did fine for a
8  month, they did things together, he was in for
9  his curfew, did what he needed to do, tracker
10 wrote glowing reports. The tracker moved to
11 California, nobody to fill in. Within 48 hours
12 and for the next week-and-a-half Jeremy was a
13 mess, a drunk, brought back to the Youth Center
14 acknowledging that his family just couldn't
15 manage him. He then went through a series of
16 ICU, back to the cottage, back to isolation and
17 in late January '94 he confessed to thinking
18 about wanting to run away and feeling suicidal
19 and the Youth Center's response to that was to
20 lock him in isolation, not to deal with the
21 issues but lock him in isolation. When he came
22 out, put him in the secure treatment unit, which
23 is basically a locked unit, and with your
24 indulgence I will just read the five entries
25 from that unit. On February 4th the director of

42

1  that unit, who is a psychologist and does
2  psychological evaluations, analysis was Jeremy
3  needed to go into the adult system at age 15,
4  that was his treatment plan for Jeremy. Three
5  days later there was a report he needed to go to
6  the Day One long term treatment program and then
7  to Arizona. On February 16th the director of
8  the program says well if he can make it through
9  this program for the next two weeks we're going
10 to put him on a bus to Arizona. Two weeks later
11 have week motivation, is delinquent and he is
12 doing okay in this program but collapses easily
13 and never make it in the community. And that
14 was the day they put him on a bus to Arizona to
15 go back to his family. He was gone for about
16 eight months when he came back. He had lost 30
17 pounds. They had to hospitalize him because of
18 the drug use and the other things that had gone
19 on. They released him twice more. That is the
20 kind of treatment that he received during that
21 five year period and again and again and again
22 they identified substance abuse as an issue and
23 failed to provide even an iota of treatment for
24 that. He has, he was arrested on these
25 charges, he was released on September 1st of

43

1  1995 and was out for about a month which is when
2  all of these things occurred. And, again, the
3  record is very clear that during that entire
4  time he was ingesting crack cocaine and PCP as
5  much and as fast as he could get his hands on it
6  when he came back in October of 19 — he's been
7  incarcerated since October of 1995, October 2nd.
8  He was in the isolation unit at the Maine Youth
9  Center until about early June and has been at
10 the York County Jail since then. Because of the
11 nature of the statutes he's not received any
12 credit for time served. So he's been in for
13 what would under the old statute be the
14 equivalent of maybe 18,19 months, he's done that
15 much time and will not be getting credit for
16 that time as a result of what occurs here. The
17 second issue is one of deterrence and I think,
18 again, I think this is a reasonable sentence. I
19 think the amount of time on probation and the
20 underlying amount of time is appropriate.
21 Jeremy has indicated to me and demonstrated to a
22 number of people his commitment to change. I
23 think he's indicated that he feels serious
24 remorse for his crimes. And I would at the
25 bindover hearing the psychologist, Dr. Carbon

44

1  testified that Jeremy did exhibit remorse and he
2  said it's, he qualified that by about saying
3  it's very difficult for children or anyone who's
4  faced with these kind of serious consequences to
5  have enough emotional stability to exhibit the
6  kind of remorse that you'd want out of someone
7  but that is just the nature of the mind, it's
8  really hard to exhibit remorse when your under
9  the gun and under that kind of pressure. He
10 said what impressed him was Jeremy's ability to
11 connect to people. Jeremy was working with an
12 AA sponsor who came in weekly and was very
13 impressed with Jeremy's commitment to change, in
14 large part because by the time he had been out
15 for a month and had been using those drugs and
16 been out, that far out of control, he came back
17 have ill and really realized that this was not
18 something that he wanted to do, and was really,
19 of course it's too late at that point, but the
20 AA sponsor felt there really was some change
21 here. And the psychologist again found that the
22 people at the Youth Center liked Jeremy, said
23 the basis of remorse is ability to connect with
24 people and Jeremy after all he's been through
25 still has the ability to connect with people.

**45**

1    Again, I don't think that he is -- the other
2    thing that the physchiatrist said that I think
3    is important is that Jeremy has a motivation to
4    change, that the bad news is that he is
5    depressed, the good news is that that depression
6    motivates him to change. He's not happy with
7    his life, he is not happy with his situation and
8    he says that that is a major factor. Finally
9    would urge the Court to impose the sentence as
10    it's been recommended here and indicate that
11    Jeremy would just like to say a few brief words
12    to the Court.
13    THE COURT:  Mr. Bender.
14    THE DEFENDANT:  I would just like to say
15    that I am sorry for all the stuff I did and I
16    realize that it was real bad and after I get
17    done with my sentence, doing my time and stuff,
18    that I am going to go to the Day One program and
19    take advantage of that and do that and try to
20    get on with my life after all this stuff.
21    THE COURT:  Mr. Bender, I should tell
22    you for the record, because you were not
23    present, that I had a prehearing conference with
24    your attorney and the attorney for the State,
25    and at that time Mr. Chester gave me even more

**46**

1    information and both of the parties had
2    presented me with the reports from the
3    psychologist. You have an extraordinary history
4    of having substance abuse difficulties and
5    psychological problems that have never been
6    addressed. You have not to this point had the
7    strength on your own to make sure they got
8    addressed, nor has the State done its job to
9    help you with addressing those problems and Mr.
10    Chester I think was kind here today in
11    indicating the ways in which the State has
12    failed you. I don't have any question that this
13    in fact occurred and I think what is happening
14    at the Youth Center these days is itself a major
15    problem, but that is no longer something for you
16    to be looking back to, you need to look forward
17    to what you are going to do in the future.
18    Your attorney convinced me that the sentence
19    that was originally proposed by the State which
20    you were going to have an opportunity to argue
21    again against was slightly harsh, that is that
22    the 14 years underlying your sentence was
23    probably too much under the circumstances and I
24    think the agreement of the State and your
25    attorney and yourself at this point is exactly

**47**

1    on point. It's very appropriate for the crimes.
2    It does not diminish the serious nature of your
3    crimes. It requires you to spend a significant
4    amount of time in jail, and it places you on
5    probation for a very long time because it's
6    going to take you a very long time to get your
7    life in order and keep it in order. I don't
8    want you to underestimate how hard that is going
9    to be. When you get out of prison in
10    approximately two years from now, depending on
11    what occurs in Cumberland County, you are going
12    to go into the Day One program, if it is still
13    available and if they will accept you. You are
14    going to go into whatever other program your
15    probation officer requires of you if that is not
16    available and that is when the hard part starts.
17    Now you know yourself every time you have tried
18    in the past something has happened and you
19    haven't been able to make it. Now you know that
20    you are responsible for saying to the people
21    around you I need help and I need it now. And
22    you have got to be able to do that when you are
23    released from prison. If you don't, I don't
24    need to tell you this, you have talked with Mr.
25    Chester --

**48**

1    THE DEFENDANT:  Right.
2    THE COURT:  If you don't the rest of
3    your life will be spent in a jail in some State
4    and coming in and out of a courtroom like this
5    and you will waste an entire lifetime. Can you
6    understand that, Mr. Bender.
7    THE DEFENDANT:  Yes.
8    THE COURT:  All right. Let me note for
9    the record then that I find that there is
10    clearly a factual basis for the plea that is
11    being entered here today, Mr. Bender has
12    discussed this matter with his attorney, he's
13    given it some thought, he is here today telling
14    me that he wants to waive his rights to have a
15    trial in any of these charges and I am confident
16    that in fact he understands what those rights
17    are. I am also confident that he has knowingly
18    and intelligently given up his rights to have a
19    trial on all these charges and I am confident he
20    now understands the ramifications of this plea,
21    that is he is going to be incarcerated for a
22    period of up to two years, that he is going to
23    have an underlying sentence on the first count
24    of six years, on the second count of four years
25    and concurrent sentences on the other matters.

**49**

1 More to the point, Mr. Bender understands that
2 he is going to be on probation for a ten-year
3 period. Now one of the things I want to make
4 sure you do understand clearly, Mr. Bender,
5 before we're through here today are the
6 components of your probation because they are
7 what will determine whether or not you are back
8 in jail immediately. You understand that first
9 and foremost you are not going to use alcohol or
10 illegal drugs.
11     THE DEFENDANT: Yes.
12     THE COURT: And it's very simple for me
13 to say and simple for you to agree with but will
14 be the most difficult thing you will ever do, to
15 make sure you don't use drugs or drink at all
16 ever, you are going to submit to a search at the
17 random request of a law enforcement official,
18 that may include a blood, breath or urine test
19 in order to assure you don't have alcohol or
20 drugs near you and you are not using them. And
21 remember you cannot have them near you. If you
22 are with people who have drugs you will be
23 violating your probation. If you are with
24 people who are drinking you will be violating
25 your probation, you understand that?

**50**

1     THE DEFENDANT: Yes.
2     THE COURT: It is something you need to
3 stay away from at all costs. You are also going
4 to undergo substance abuse treatment, whatever
5 that treatment is that is recommended by your
6 probation officer. The first treatment you are
7 going to undergo will be the Day One year-long
8 program if they will accept you and if they are
9 still in place when you are released. Given the
10 resource issues we have in this State and other
11 States have that may have changed by the time
12 you are released but make no mistake about it,
13 you are going to go into a treatment program
14 that is residential that your probation officer
15 requires. You are clear on that too?
16     THE DEFENDANT: Yes.
17     THE COURT: All right. In addition, you
18 are also going to get into counseling,
19 psychological or psychiatric counseling as
20 recommended by your probation officer and stay
21 in that counseling and it is not going to clear
22 up your life in a matter of weeks. We're
23 talking about a course of years here. And you
24 must stay in that counseling during the entire
25 time that your probation officer says that you

**51**

1 have to, do you understand that?
2     THE DEFENDANT: Yes.
3     THE COURT: All right, you are not going
4 to have any contact whatsoever, direct or
5 indirect, with Jameson Sneider or Michael
6 Zelensky. In addition, and I am now making this
7 is a condition of your probation, you obviously
8 know by now you need to stay away from those
9 other people who assisted you in dragging your
10 life right down the tubes, you need to make sure
11 that you don't get near people who are going to
12 pull you away from the programs that you are in
13 and bring you back here and send you back to
14 jail. That is something only you will
15 understand when you get out that you know who to
16 stay away from. I don't need to tell you here
17 today. With regard to restitution, the parties
18 have agreed that restitution up to the amount of
19 ten thousand dollars to the appropriate victims
20 would be paid by the end of the ten year
21 probationary period with understanding that
22 would be payment of approximately a thousand
23 dollars per year. Before I impose that,
24 understanding that Mr. Bender has agreed that he
25 will make that restitution as appropriate, I

**52**

1 need to make sure that he is in fact going to be
2 employable when he is released. The Day One
3 program will allow employment after a certain
4 period of time but I think there are several
5 months without employment. Although a thousand
6 dollars is not an extraordinary amount to pay in
7 the course of a year. Mr. Bender, have you ever
8 been employed for any period of time?
9     THE DEFENDANT: No.
10     THE COURT: Did you complete high school
11 or do you have your GED?
12     THE DEFENDANT: No.
13     THE COURT: How far do you have to go to
14 complete high school, do you know?
15     THE DEFENDANT: I am taking my GED right
16 now.
17     THE COURT: You are working on your GED?
18     THE DEFENDANT: Right.
19     THE COURT: So by the time you are
20 released you anticipate having your GED?
21     THE DEFENDANT: Yes.
22     THE COURT: If there are programs
23 available, likelihood is Windham?
24     MR. MOSKOWITZ: That is my assumption,
25 Your Honor.

53

1    THE COURT:  Although that is never
2  altogether clear, does Windham have any
3  continuing education programs left?
4    MR. CHESTER:  I don't know, judge.
5    THE COURT:  The last I knew they were
6  being limited. I can only recommend, Mr.
7  Bender, that you get into whatever programs they
8  have for continuing education which will make
9  you more employable and make your life better
10 when you are released.  Do you have any concerns
11 about your ability to meet this requirement that
12 you are going to pay a thousand dollars per
13 year?
14   THE DEFENDANT: No.
15   THE COURT:  All right, with that, then,
16 I will order restitution up to ten thousand
17 dollars, no more than a thousand dollars per
18 year unless required by Probation and Parole, to
19 be paid through the Department of Probation and
20 Parole. Let me also note for the record that
21 the State's representations with regard to the
22 consecutive sentences on Count I and Count II
23 are in agreement with my take on these crimes,
24 in fact the crimes on Count I and II were
25 different episodes, they occurred during the

54

1  time that Mr. Bender was on release from a
2  program and the nature of the conduct and Mr.
3  Bender's history certainly indicate that
4  consecutive sentence is, under the
5  circumstances, are appropriate, therefore, I
6  will finally accept the pleas of guilty to each
7  of these nine counts.  I will impose the
8  sentences as recommended by the parties, noting
9  for the record that that sentence has been
10 changed as a result of some of my original
11 concerns so the record should reflect those
12 concerns.   There is no requirement that I go
13 through a Hewey analysis given that the parties
14 have arrived at this agreement but I think it is
15 important that the Court do at least a brief
16 analysis so that it's clear that this is an
17 appropriate sentence under the circumstances.
18 With regard to Count I, the sentence is a
19 sentence of two years to the Department of
20 Corrections -- I am sorry, six years to the
21 Department of Corrections, all but two years
22 suspended and a period of probation of six years
23 with each of those special conditions that I
24 have previously listed.  That six year
25 underlying sentence was arrived at by counsel

55

1  and obviously began at the initial part of the
2  Hewey analysis and then became a final sentence.
3  It appears to me to be appropriate under the
4  circumstance, in fact the original was a ten
5  year underlying sentence which by itself did not
6  exceed what I think is appropriate under the
7  circumstances, added, however, to the underlying
8  sentence in Count II, together I concluded that
9  that was too much of an underlying sentence,
10 therefore, the six years is perfectly reasonable
11 here. I will accept it. It's clear to me that
12 Mr. Bender has the possibility of rehabilitating
13 himself. It is only a possibility. I don't
14 even know at this point, Mr. Bender, whether
15 it's a probability. You are the only one who
16 knows that, and, therefore, the six-year period
17 of probation is perfectly appropriate and the
18 reduction of the actual time in jail to two
19 years under the circumstances I find also to be
20 reasonable.  I think that in fact the two year
21 sentence in jail is a bit light for the charges
22 that are here particularly considering that guns
23 were involved, however, I will note and take
24 into consideration the fact that Mr. Bender has
25 been incarcerated for quite a period of time now

56

1  for which he will receive no credit, and,
2  therefore, the two years is determined to be
3  appropriate.
4    With regard to Count II, the sentence
5  will be four years to the Department of
6  Corrections, all suspended and a period of
7  probation of four years to run consecutive to
8  Count I. Again that four year sentence is
9  perfectly appropriate under the circumstances.
10 It's the full suspension of that four years is
11 obviously in order to allow Mr. Bender to begin
12 his rehabilitation process immediately upon
13 completing the two years on Count I. It is
14 appropriate I hope, once again, Mr. Bender, that
15 you take advantage of the services that are
16 provided to you through the Probation and
17 Parole.
18    With regard to Count III, a two
19 year sentence to the Department of Corrections
20 will be imposed.  It is a straight sentence,
21 will be concurrent with Count I. I am not going
22 to disturb the recommendations of the parties.
23 This is a Class C criminal offense with a
24 minimum of a year underlying.  I am not
25 altogether certain that if I were not

57

1  structuring this sentence on my own I might not
2  have made that a four year sentence under the
3  circumstances. I am not going to disturb it.
4          With regard to Count IV,
5  parties have recommended 12 years, I am sorry,
6  12 months to Department of Corrections, also
7  concurrent with Count I, and I will accept that
8  sentence. Count V is a 364 day sentence to the
9  Department of Corrections, I will also accept
10  that, also concurrent with Count I.
11          Count VI through IX, all
12  misdemeanor charges will have imposed six months
13  concurrent with Count I to the county jail.
14  Obviously the sentence will be served through
15  the Department of Corrections on the major
16  sentences. Conditions of probation have
17  already been laid out, Mr. Bender understands
18  those, accepts them and will comply with them;
19  is that correct, Mr. Bender?
20          THE DEFENDANT: Yes.
21          THE COURT: Mr. Bender, let me tell you
22  one final thing here. It seems to me that Mr.
23  Chester has given you a great deal of
24  assistance. If you were here in court going
25  through trial and convicted of these offenses

58

1  you would certainly be looking at a much longer
2  initial time in jail; do you understand that,
3  Mr. Bender?
4          THE DEFENDANT: Yes.
5          THE COURT: I want to make sure that you
6  do because I know you have spent much of your
7  time in the juvenile system and those sentences
8  are indeterminate and been released on a regular
9  basis when it's perhaps you shouldn't have been.
10  If you are back in the adult system again on
11  these kinds of charges you are going to spend
12  most of your young adult life in jail. And I
13  don't think there's much question about that. I
14  just want you to keep that in mind as you begin
15  the process of moving onward with your life.
16          You have a right to appeal the
17  sentences I have just imposed. You need to
18  review that right with your attorney. You are
19  about to be given a document, please go through
20  that with Mr. Chester and make sure you
21  understand it in full. You want to understand
22  that also in the context of whatever is
23  happening in Cumberland County, and I am sure
24  Mr. Chester will assist you with that, with
25  regard to the victim fund sur charges of which

59

1  there would be a hundred twenty five, plus
2  forty, one sixty five, Mr. Bender, do you have
3  any money in your jail account?
4          THE DEFENDANT: Yes.
5          THE COURT: How much?
6          THE DEFENDANT: Twenty dollars.
7          THE COURT: State have any objection to
8  my waiving the victim sur charges?
9          MR. MOSKOWITZ: No, Your Honor.
10          THE COURT: When you are released from
11  jail you need to be attending to restitution
12  right away. And I am going to waive the victim
13  sur charges on each of the separate nine counts
14  here. Is there anything further from counsel
15  this morning?
16          MR. CHESTER: Your Honor, I want to be
17  clear. I think you said that he was to pay
18  that, the restitution, the ten thousand dollars
19  at a thousand dollars a year or more as directed
20  by Probation and Parole?
21          THE COURT: Yes.
22          MR. CHESTER: I am a little concerned
23  about the first year. I was — I would ask the
24  Court to except the first year, assuming that he
25  does get into a program like Day One, I suspect

60

1  that he will not be allowed off the campus for a
2  significant period of time.
3          THE COURT: I think you are right.
4          MR. CHESTER: And so if we could exempt
5  that year, first year he would still have nine
6  years to catch up and I don't think that would
7  be unreasonable to expect him to make that up.
8          THE COURT: I assume the State has no
9  objection?
10          MR. MOSKOWITZ: No, that sounds
11  reasonable, Your Honor.
12          THE COURT: And I am going to include
13  then in the restitution requirement that the one
14  thousand or more per year does not apply to year
15  one so long as Mr. Bender is in fact residing in
16  the program. The minute he leaves that program
17  he has got a probation violation issue all on
18  its own but if he is no longer in a residential
19  program that is limiting his ability to be
20  employed then certainly he should be out there
21  working and getting the restitution paid.
22          MR. CHESTER: Thank you.
23          THE COURT: You understand what I am
24  saying, Mr. Bender?
25          THE DEFENDANT: Yes.

61

```
 1          THE COURT:  If you are in that program
 2    during that first year you do not need to
 3    concentrate on restitution during that first
 4    year, concentrate on staying clean and sober,
 5    getting a education. And anything further?
 6          MR. MOSKOWITZ:  No.
 7    (Whereupon, the sentencing was concluded.)
 8              *    *    *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

62

```
 1
 2
 3          REPORTER'S CERTIFICATE
 4
 5     I hereby certify that the foregoing is a
 6    correct transcription of my stenographic notes
 7    of the testimony and proceedings at the trial of
 8    the above-mentioned cause.
 9    Dated this 15th day of December, 1999.
10
11
12         Kathleen S. Casey, CSR, RPR
13                *****
14
15
16
17
18
19
20
21
22
23
24
25
```

A TRUE COPY ATTEST

CLERK

From:Federal Public Defender      To:913184737435      12/20/2010 17:40      #421 P.024/044

# STATE OF MAINE
# SUPERIOR COURT                                    JUDGMENT AND COMMITMENT

| Docket No. | | | Di | | DOB |
|---|---|---|---|---|---|
| CR96-1972 | | County Cumberland | | 11/1/96 | 03/02/79 |

State of Maine   v.   Defendant's Name
Jeremy Bender

Residence

RECEIVED NOV 16 2010

| Offense(s) charged: | | | Charged by: |
|---|---|---|---|
| #1, Burglary——Class B | T17-A | §401 | ☐ indictment |
| #2, Theft——Class C | T17-A | §353 | ☒ information |
| #3, Burglary——Class A | T17-A | B§401 | |
| #4, Theft——Class E | T17-A | §353 | ☐ complaint |

Plea(s): _Guilty;_

| Offense(s) convicted: | | | Convicted on: |
|---|---|---|---|
| #1, Burglary——Class B | T17-A | §401 | ☒ plea of guilty |
| #2, Theft——Class C | T17-A | §353 | ☐ plea of nolo |
| #3, Burglary——Class A | T17-A | §401 | ☐ jury verdict |
| #4, Theft——Class E | T17-A | §353 | ☐ court finding |

IT IS ADJUDGED THAT THE DEFENDANT IS GUILTY OF THE OFFENSES AS SHOWN ABOVE AND CONVICTED.

☒ IT IS ADJUDGED THAT THE DEFENDANT BE HEREBY COMMITTED TO THE SHERIFF OF THE WITHIN NAMED COUNTY OR HIS AUTHORIZED REPRESENTATIVE WHO SHALL WITHOUT NEEDLESS DELAY REMOVE THE DEFENDANT TO:

☒ The custody of the Commissioner of the Department of Corrections, at a facility designated by the Commissioner, to be punished by imprisonment for a term of _6 yrs as to ct. 3 - concurrent w/ York Cty. 96-1066; 4 yrs. as to ct. 1+2 each concurrent w/ the other but consecutive to ct. 3_

☒ The County jail to be punished by imprisonment for a term of _6 months as to ct. 4 concurrent w/ ct. 3, but consecutive to ct. 1+2_

#1-2 ☒ This sentence to be served consecutive to _counts 3 + 4 PAF_

☐ Execution stayed to on or before:_____ at _____ (a.m.) (p.m.)

☒ IT IS ORDERED THAT ALL (BUT) _as to cts. 2½ yrs._ OF THE FOREGOING SENTENCE BE SUSPENDED AND THE DEFENDANT BE COMMITTED TO THE CUSTODY AND CONTROL OF THE DIVISION OF PROBATION AND PAROLE FOR A TERM OF _6 yrs. as to ct. 3 - 4 yrs. consecutive as to ct. 1+2_ UPON CONDITIONS ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN. SAID PROBATION TO COMMENCE (_____) (UPON COMPLETION OF THE UNSUSPENDED TERM OF IMPRISONMENT). THE DEFENDANT SHALL SERVE THE INITIAL PORTION OF THE FOREGOING SENTENCE AT _____

☐ The final _____ month(s) of the unsuspended portion of the term of imprisonment is to be served with intensive supervision under conditions separately specified and incorporated herein.

☐ IT IS ORDERED PURSUANT TO APPLICABLE STATUTES, THAT THE DEFENDANT'S MOTOR VEHICLE OPERATOR'S LICENSE OR PERMIT TO OPERATE, RIGHT TO OPERATE A MOTOR VEHICLE AND RIGHT TO APPLY FOR AND OBTAIN A LICENSE IS SUSPENDED FOR A PERIOD OF _____
☐ IT IS FURTHER ORDERED THAT THE DEFENDANT'S RIGHT TO REGISTER A MOTOR VEHICLE IS SUSPENDED AND THE REGISTRATION PLATES ISSUED TO THE DEFENDANT BY THE STATE ARE SUSPENDED.
  ☐ Suspension effective beginning_____ at _____ (a.m.) (p.m.)
  ☐ Suspension effective beginning after release from incarceration. (17-A MRSA §1103, sub-§ 6)

CR-1 Rev. 9/95                          (OVER)

☐ IT IS ORDERED THAT THE DEFENDANT FORFEIT AND PAY THE SUM OF _____ DOLLARS, AS A FINE, PLUS A 10% SURCHARGE, TO THE CLERK OF THE COURT. (4 M.R.S.A. § 1057)

☐ IT IS FURTHER ORDERED THAT THE DEFENDANT PAY AN ADDITIONAL: ☐ $30.00  ☐ $125.00 SURCHARGE TO THE CLERK OF THE COURT. (29 M.R.S.A. § 1312-B(5), 29-A M.R.S.A. § 2411 (7))

☒ IT IS FURTHER ORDERED THAT THE DEFENDANT PAY AN ASSESSMENT OF $10.00 FOR EACH CLASS D AND E CONVICTION AND $25.00 FOR EACH MURDER AND CLASS A, B, AND C CONVICTION FOR A TOTAL OF _____$85.—_____ TO THE CLERK OF THE COURT FOR THE VICTIMS' COMPENSATION FUND. (5 M.R.S.A. § 3360-I)   $_____ OF THE ASSESSMENT HAS BEEN PAID.

    ☐ All but _____ suspended.
    ☒ Execution/payment stayed to pay in full by _w/in first 18 mths_____ or warrant to issue.
    ☐ To pay $_____ per week / month beginning ___probation___ or warrant to issue.

☐ IT IS ORDERED THAT EXECUTION OF THE FOREGOING SENTENCE AS IT RELATES TO THE FINE BE SUSPENDED AND THE DEFENDANT BE COMMITTED TO THE CUSTODY AND CONTROL OF THE DIVISION OF PROBATION AND PAROLE FOR A TERM OF _____ UPON CONDITIONS ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN.

☐ IT IS ORDERED THAT THE DEFENDANT PERFORM _____ HOURS OF COMMUNITY SERVICE WORK WITHIN _____ (WEEKS) (MONTHS) FOR THE BENEFIT OF _____

☒ IT IS ORDERED THAT THE DEFENDANT FORFEIT AND PAY THE SUM OF _$10,000,—_ DOLLARS AS RESTITUTION, THROUGH THE (DIVISION OF PROBATION AND PAROLE) (DISTRICT ATTORNEY'S OFFICE) FOR THE BENEFIT OF_ victims _____
    (17-A M.R.S.A. § 1152-2-A)
    ☒ Execution/payment stayed to pay in full by _at rate of $1,000.—_ or warrant to issue.

☐ IT IS ORDERED THAT THE DEFENDANT PAY _____ FOR EACH DAY SERVED IN THE COUNTY JAIL, TO THE TREASURER OF THE ABOVE NAMED COUNTY. (17-A M.R.S.A. § 1341)
    ☐ Execution/payment stayed to pay in full by _____ or warrant to issue.

☐ IT IS ORDERED THAT THE DEFENDANT SHALL PARTICIPATE IN ALCOHOL AND OTHER DRUG EDUCATION, EVALUATION AND TREATMENT PROGRAMS FOR MULTIPLE OFFENDERS ADMINISTERED BY THE DEPARTMENT OF HUMAN SERVICES. (29 M.R.S.A. § 1312-B (2)(D-1), 29-A M.R.S.A. § 2411 (5)(E))

☐ IT IS ORDERED THAT THE DEFENDANT FORFEIT TO THE STATE THE FIREARM USED BY THE DEFENDANT DURING THE COMMISSION OF THE OFFENSE(S) SHOWN ABOVE. (17-A M.R.S.A. § 1158)

☐ IT IS ORDERED THAT THE DEFENDANT BE UNCONDITIONALLY DISCHARGED. (17-A M.R.S.A. § 1201)

IT IS FURTHER ORDERED THAT THE CLERK DELIVER A CERTIFIED COPY OF THIS JUDGMENT AND COMMITMENT TO THE SHERIFF OF THE ABOVE NAMED COUNTY OR HIS AUTHORIZED REPRESENTATIVE AND THAT THE COPY SERVE AS THE COMMITMENT OF THE DEFENDANT. REASONS FOR IMPOSING CONSECUTIVE SENTENCES ARE CONTAINED IN THE COURT RECORD OR IN ATTACHMENTS HERETO.

A TRUE COPY, ATTEST: _____   _____
    Clerk, Superior Court   Justice, Superior Court

I understand the sentence imposed herein and acknowledge receipt of a copy of this JUDGMENT AND COMMITMENT.

Dated: _November 1, 1996_____   x _____
    Defendant

**RETURN**

By virtue of the within JUDGMENT AND COMMITMENT I have this day delivered the within-named Defendant to the
_____

Dated: _____   _____
    Deputy Sheriff

By virtue of this warrant, the within-named Defendant has been removed to and received at the _____
_____ on this day.

Dated: _____   _____
    Authoriz  fficer/Supt., M.C.C./Warden M.S.P.

STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, SS.                                   CRIMINAL ACTION
Docket No. CR-96-1972


STATE OF MAINE

v.

JEREMY BENDER


BEFORE:
    The Honorable Paul A. Fritzsche, Justice of the
    Superior Court, in Portland, Maine, on Friday,
    November 1, 1996.


APPEARANCES:

    Howard F. O'Brien, Esq.
    For the State

    Edwin P. Chester, Esq.
    For the Defendant



A True Copy
Attest: Jolly A. Bengel
Clerk of Courts

OFFICIAL TRANSCRIPT
Prepared by the Electronic Recording Division

ORIGINAL

INDEX OF WITNESSES

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| No Witnesses | | | | |

INDEX OF EXHIBITS

| EXHIBITS | MARKED | OFFERED | ADMITTED |
|----------|--------|---------|----------|
| No Exhibits | | | |

2

1       (This matter came on for hearing before The Honorable

2   Paul A. Fritzsche, Justice of the Superior Court, at the

3   Cumberland County Courthouse, Portland, Maine, on Friday,

4   November 1, 1996.)

5       COURT:  Mr. Jeremy Bender with Mr. Chester. This is

6   Docket Number 96-1972.  Is this going to be a plea to all

7   charges?

8       EDWIN P. CHESTER, ESQ.:  Yes, Judge.

9       COURT:  Would you give this to Mr. Chester and -- we

10  won't have anybody sign it quite yet.  There's some things I

11  need to go over first.  Mr. Bender, the State would like to

12  bring four charges against you in what's called an

13  information.  I would like to first tell you what those

14  charges are and then talk to you about the difference between

15  informations and indictments. The first charge, and you can

16  follow along with Mr. Chester, is a charge of burglary.  It's

17  a Class B charge that's claimed to have occurred on September

18  21st, 1995, at the home of the Flannerys [sic] in Westbrook.

19  Are you aware the State would like to bring that charge

20  against you?

21      JEREMY BENDER, DEFENDANT:  Yes.

22      COURT:  Do you know it has a maximum possible sentence,

23  by law, of ten years?

24      MR. BENDER:  Yes.

25      COURT:  The second charge they'd like to bring against

3

1    you is called a Class C theft charge.  That's a claim that on
2    September 21st, 1995, also in Westbrook, you stole property
3    from the Flannerys, being jewelry, and the value was more than
4    two thousand dollars.  Are you aware of that charge and it's
5    maximum possible sentence of five years?

6           MR. BENDER:  Yes.

7           COURT:  Now the third charge they'd like to bring against
8    you is a charge of Class A burglary.  It's a claim that on
9    September 28th, 1995, in Pownal, you committed a burglary at
10   the home of Susan and William Martins [sic] and at that time
11   you were armed with a firearm.  Are you aware that that charge
12   would like to be brought, and that has a possible maximum
13   sentence of twenty years?

14          MR. BENDER:  Yes.

15          COURT:  Then the last charge they'd like to bring against
16   you is one of theft, Class E, of checks and money of a value
17   of less than a thousand dollars from the Martins in Pownal.
18   Are you aware they'd like to bring that charge as well?

19          MR. BENDER:  Yes.

20          COURT:  Now, the normal procedure, in order for the State
21   to bring the two burglary and the Class C theft charge, is to
22   go before a body called the Grand Jury.  A Grand Jury consists
23   of thirteen to as many as twenty-three people from throughout
24   all of Cumberland County who will meet privately here in the
25   courthouse and will hear the State's side of the case.  They

4

1 | can decide that there's enough evidence to charge you or they
2 | can say to the State, "You don't have enough evidence, we
3 | aren't going to charge Mr. Bender." So the normal process for
4 | these -- the more serious charges in the first three counts is
5 | to go before this Grand Jury and see if the Grand Jury will
6 | indict you -- or charge you. You have the right, if you wish,
7 | to say, "I don't care about that, I'm willing to skip that or
8 | waive that," and proceed instead on what's called an
9 | information. What an information is, it's simply charges that
10 | are brought on the signature of a prosecutor as opposed to the
11 | vote of a Grand Jury. No one can take away your right to have
12 | a Grand Jury indictment or to insist that they go before a
13 | Grand Jury. You can give up that right if you want, but you
14 | cannot be forced to do that. Do you have any questions about
15 | informations or indictments?

16 | MR. BENDER: No.

17 | COURT: If it's your desire to give up your right to
18 | indictment and proceed on an information, you can sign the
19 | paper that's on the lectern in front of you.

20 | MR. CHESTER: Your Honor, for the record, this young man
21 | was bound over yesterday. One of the reasons for proceeding
22 | by information is that if he were to be detained without
23 | having -- and await the Grand Jury indictment, he would not be
24 | getting any credit for the time that he's serving in Windham
25 | on a separate charge, and so that is one of the major reasons

5

1   for proceeding this way today.

2        COURT:  The petition and waiver have been approved.  I

3   find that Mr. Bender is aware of the nature of the charge and

4   his rights concerning indictments and informations, and that

5   he's made a knowing, voluntary and intelligent waiver after

6   discussing the matter with counsel.  Mr. Bender, now getting

7   to the merits of the charges, have you had a chance to discuss

8   the details of the charges fully with your attorney?

9        MR. BENDER:  Yes.

10       COURT:  Is there anything you still want to ask him about

11   or anything you'd still like him to do?

12       MR. BENDER:  No.

13       COURT:  Do you have any disagreement with how he's

14   handled your case?

15       MR. BENDER:  No.

16       COURT:  Do you know that if you plead guilty to the

17   charges there's not going to be a trial?

18       MR. BENDER:  Yes.

19       COURT:  You know that if you went to trial, your trial

20   would be reasonably soon, you'd have the right to a public

21   trial and your trial could either be with a jury or just with

22   a judge.  So you know you have those rights concerning a trial

23   which will be given up if you plead guilty?

24       MR. BENDER:  Yes.

25       COURT:  Now, there's a number of rights and protections

6

1   that would normally be part of a trial and those will be gone

2   if you plead guilty.  They include the following: First, if

3   you had a trial the witnesses against you have to come into

4   court and testify and your attorney can thoroughly question

5   them to make sure they've got their story correct and what

6   they're telling is accurate -- to see if there's any

7   weaknesses in what they have to say.  Secondly, if you knew of

8   any people by information was related to the charges and

9   helpful to your side, you could have those people be witnesses

10  for you.[sic]  In other words, you can present witnesses in

11  your defense, if you want, at a trial.  Third, your attorney

12  would give you his best advice, but then you'd make up your

13  mind as to whether you wanted to testify personally and tell

14  your side in your own words, or remain silent and say nothing

15  at all.  If you decided at a trial that you did not want to

16  testify, that's fine and that's not to be held or used against

17  you.  Either decision is one that's legally acceptable.  The

18  last right you give up is if you had gone to trial you would

19  start the trial with what's called a presumption of innocence.

20  That means when you begin, you're not guilty and you stay not

21  guilty unless the State can present enough -- strong enough

22  evidence to prove your guilt by proof beyond a reasonable

23  doubt.  So that means that the State has to prove the charge

24  against you, you don't have to prove your innocence.  So, do

25  you know that all of those rights are gone if you decide to

7

1    plead guilty?

2       MR. BENDER:  Yes.

3       COURT:  Other than your plea bargain, has anybody

4    promised you anything to get you to plead guilty?

5       MR. BENDER:  No.

6       COURT:  Have you been forced or threatened to get you to

7    plead guilty?

8       MR. BENDER:  No.

9       COURT:  If you do plead guilty it will be of your own

10    free will and free choice.

11       MR. BENDER:  Yes.

12       COURT:  Now, on the burglary charge, the one involving

13    the Flannerys in Westbrook, the State has to prove three

14    things.  First, that you went into their house, you had no

15    permission or right to do so, and you went in with the thought

16    of stealing something.  So do you know that that's what's

17    meant by a Class B burglary?

18       MR. BENDER:  Yes.

19       COURT:  Count II, the theft charge -- very

20    straightforward -- they have to prove that you took jewelry

21    from their house and the value of the jewelry was more than

22    two thousand dollars and you took it with the intention -- the

23    thought of depriving them of their property.  You weren't just

24    borrowing it, you were planning on keeping it for -- well,

25    permanently or selling it or in some way getting rid of it in

1   a way that it wouldn't go back to them.  So you know that's

2   what's meant by the theft charge?

3        MR. BENDER:  Yes.

4        COURT:  And lastly, on the Class A burglary, the State

5   has to prove all the things for a normal burglary; that you

6   went into the Martins' house in Pownal, you had no permission

7   to do so, and you had the intention of stealing something.

8   Then they also have to prove that at the time you went into

9   the house you were armed with a firearm.  It's not saying that

10  you used it or you hurt anybody, but you had a gun of some

11  nature with you at the time of the burglary.  So you know that

12  that's what's meant by that charge?

13       MR. BENDER:  Yes.

14       COURT:  Ms. Pope? [sic]

15       MS. POPE:  I'm sorry, this is Mr. O'Brien's --

16       COURT: Oh, not you, Mr. O'Brien?  That's the danger of

17  standing up.

18       MS. POPE:  Yes, Your Honor.

19       COURT:  Mr. O'Brien.

20       HOWARD F. O'BRIEN, ESQ.:  Thank you, Your Honor.  If this

21  were to proceed to trial we'd present the testimony of Maria

22  Flannery, who would testify that on September 21st, 1995 she

23  left her house at about 5:25 p.m., returned at about 5:50 to

24  find that the side door had been kicked in, the house was

25  ransacked and her bedridden mother was very upset.  She

9

1    discovered that over ten thousand dollars in jewelry was

2    missing.  She also I.D.'d some of the jewelry later when it

3    was recovered.  We'd also present the testimony of Angelina

4    Ranieri, [sic] who is the mother in this case.  She was home

5    during the burglary.  Two men came in; one black, one white.

6    The white male stood by her bed while the black male went

7    upstairs and then her daughter returned.  We'd present the

8    testimony of Richard Finnerty, a neighbor, who said that about

9    5:15 two men in a small grey car pulled into his driveway to

10   inquire about a car he had for sale and he I.D.'d the black

11   male, Jamison Snyder [sic], later. Two other neighbors,

12   Ronald Reed and Leslie Nichols [sic], saw the same dark

13   colored car with temporary plates in the neighborhood at this

14   time.  John Searles, [sic] from Westbrook, would testify that

15   he sold that car to Jamison Snyder just five days before that.

16   We'd also present the testimony of Sandra Gray [sic] of -- in

17   Biddeford, who said that about eleven o'clock on that same

18   night, that that car was parked in her driveway, a black male

19   ran away from it, police got a warrant, searched the car and

20   found some of the jewelry and other things inside the car.   On

21   the 28th of September -- we'd present the testimony of Susan

22   Martins, who'd testify that on the 28th she was in her home in

23   Pownal and found a black male standing in her kitchen smoking

24   a cigarette, a white male came up behind her and the black

25   *male stole some checks and a small amount of cash out of her*

10

1   pocketbook.  We'd present the testimony of Robert Payzant

2   [sic], a taxi driver in Freeport, who would testify that the

3   defendant in this case got into his cab and went a short

4   distance and then left and Mr. Payzant later found a loaded

5   handgun in the back of the taxi.  This was also on the evening

6   of the 28th.  Sometime later, Trooper Lowell Smith received a

7   call to go to the Maine Youth Center, spoke to the defendant

8   at the Maine Youth Center and he made a full confession to

9   both burglaries.

10       COURT:  Mr. Chester, any comments upon the State's

11  claims?

12       MR. CHESTER:  No, Judge.

13       COURT:  Mr. Bender, anything you'd like to say before you

14  enter your pleas?

15       MR. BENDER:  No.

16       COURT:  Count I, the charge of Class B burglary at the

17  Flannery house in Westbrook, how do you plead?

18       MR. BENDER:  Guilty.

19       COURT:  Count II, the charge of Class C theft from them,

20  how do you plead?

21       MR. BENDER:  Guilty

22       COURT:  Count III, the charge of Class A burglary at the

23  Martins' house in Pownal, how do you plead?

24       MR. BENDER:  Guilty.

25       COURT:  And Count IV, the charge of Class E theft from

11

1  the Martins, how do you plead?

2     MR. BENDER:  Guilty.

3     COURT:  The pleas will be accepted, they're knowing

4  pleas, they're voluntarily entered, they're made after

5  sufficient discussion with competent defense counsel, and the

6  State has sufficient evidence that, if believed, would

7  establish the elements of all the offenses.  Mr. O'Brien, the

8  recommendation, please?

9     MR. O'BRIEN:  Yes, Your Honor, this recommendation

10  mirrors a plea that was taken in York County a short time ago.

11  It's a little backwards, but under Count III, the

12  recommendation is six years' Department of Corrections, all

13  but two and a half suspended, with six years probation, and as

14  far as the Count IV, the E theft -- that should be a

15  concurrent six months.  There should be the same probation

16  conditions as in York County and I can outline those for you,

17  if you'd like.

18     COURT:  Please.

19     MR. O'BRIEN:  To reside in and obtain treatment at the

20  Day One program or its equivalent during the first year of his

21  *probation; submit to substance abuse treatment and counselling*

22  to the satisfaction of Probation and Parole; not to possess or

23  consume any alcohol or illegal drugs; submit to random testing

24  of his person, place or residence and motor vehicle for

25  alcohol and illegal drugs; to engage in psychological

12

1   counselling and treatment to the satisfaction of Probation and

2   Parole; to have no contact, direct or indirect, with Jamison

3   Snyder or Michael Zelinski, that's Z-E-L-I-N-S-K-I; and to pay

4   restitution of up to ten thousand dollars during the period of

5   his probation, to be paid at the rate of one thousand dollars

6   per year.  On Count I, the Class B burglary, the sentence is

7   to be four years Department of Corrections, all suspended,

8   with four years' probation.  That's to run consecutive to

9   Counts III and IV, but also concurrent with another docket

10  number in York County, and I'm sure Mr. Chester can give you

11  both of the docket numbers --

12       MR. CHESTER:  That's 96-1066.

13       COURT:  Thank you. And Count II -- go ahead --

14       MR. O'BRIEN:  And under Count II, the Class B -- C theft,

15  it would be a concurrent four years, all suspended, with four

16  years' probation.  And it would be the same bail conditions --

17  probation conditions, with the exception of the restitution on

18  these two counts.

19       COURT:  Why wouldn't -- I understand that you wish to

20  have him have ten years of probation?

21       MR. O'BRIEN:  Oh, that's right, I'm sorry.  The

22  restitution should run on the second count as well.

23       COURT:  Mr. Chester, is that the plea agreement?

24       MR. CHESTER:  Yes, Judge.

25       COURT:  So, does this add any new time, or is this the

13

1    same amount of time he's already received?

2        MR. CHESTER:  It actually adds six months.  It was two

3    years in York County.

4        COURT:  That seems appropriate -- that there be some more

5    time 'cause there's been some more crimes. Mr. Bender, is this

6    what you've agreed to?

7        MR. BENDER:  Yes.

8        COURT:  You're how old now?

9        MR. BENDER:  Eighteen.

10       COURT:  Did you drop out of school?

11       MR. BENDER:  Yes.

12       COURT:  How far did you go?

13       MR. BENDER:  Eighth or ninth grade.

14       COURT:  Okay.  You ever had a real job of any kind?

15       MR. BENDER:  No.

16       MR. CHESTER:  Your Honor, if I may, this young man --

17   *this is one of the most tragic and outrageous cases I've ever*

18   handled.   Jeremy came into the Maine Youth Center in 1991 on a

19   criminal trespass and was there for five years, and the only

20   evaluation they ever did indicated that he needed substance

21   abuse treatment.   In the five years he was there he never

22   received any substance abuse treatment, even though they have

23   -- in fact, one of the most effective programs is a substance

24   abuse treatment cottage.  He was released from the Youth

25   Center on three occasions, and as best the records indicate

14

 1   they knew they were sending him out as an untreated addict,
 2   and they sent him out to situations where they knew he was
 3   going to fail.  And when they brought him back, they
 4   recognized that he had failed in large part because of his
 5   substance abuse problem, and yet they sent him out again and
 6   again.  The final release was in August of '95, and he was
 7   sent to Tennessee to live with his family once again. He'd
 8   been released to them each of the prior times and it had just
 9   disastrous results -- gotten worse, more dependent, more
10   problems each time.  His mother didn't even have a phone --
11   but they put him on a bus and what happened was he got to
12   Boston and ran into a friend of his and he didn't continue on
13   to Tennessee, his friend and he went to Lawrence, Mass., they
14   obtained crack cocaine, and for about a month Jeremy and his
15   friend were, basically, smoking crack cocaine and ingesting
16   various other drugs.  Jeremy takes some credit for that, and I
17   think that's appropriate.  On the other hand, this is a young
18   man, again, who went into the Youth Center on a simple
19   criminal mischief back in 1991, and. we had a three-day hearing
20   in Biddeford District Court on the bindover, and I think it
21   was a very difficult decision, but Judge Levy did bind him
22   over.  The psychologist -- my psychologist testified that
23   crack cocaine is one of the most disinhibiting substances
24   known to man, and I guess, you know, without diminishing
25   Jeremy's responsibility and -- for these offenses, and without

15

1  diminishing the injuries suffered by the victims -- nobody was

2  hurt, Jeremy never hurt anybody. He certainly threatened, he

3  committed a number of burglaries and thefts, but to his

4  credit, under very stressful circumstances, when he was under

5  the influence of very powerful drugs, nobody ever got hurt.

6  This sentence is designed, I think, to recognize and reflect,

7  perhaps, some of the State's failure to take responsibility

8  for its role in this young man's situation. We're hopeful

9  that he'll be out at a young enough age so that he can go to

10 the Day One program, which is a year-long substance abuse

11 treatment program, and it's hoped that that -- this long

12 period of probation may provide enough stability in his life

13 so that he can begin to turn things around.

14     COURT:  I sure hope so.  On Count III, the sentence will

15 be six years to the Department of Corrections, all but two and

16 a half years suspended with six years of probation.  That will

17 be concurrent with Count IV and -- that should probably also

18 be concurrent with the York County case --

19     MR. CHESTER:  Yes.

20     COURT:  -- and concurrent with York County case 96-1066.

21 On Counts I and II, since they're separate incidents, a

22 consecutive sentence will be imposed.  I and II will be

23 consecutive to III and IV, but concurrent with each other. On

24 each of I and II there will be sentences of four years to the

25 Department of Corrections, all suspended, four years of

16

1   probation.   There will be victim compensation surcharges that

2   total eighty-five dollars, payable in the first eighteen

3   months of probation.   The probation conditions will include --

4   and this may be the most important one initially -- is that

5   during the first year of probation he reside at the Day One

6   program in the proper facility designated by them, and if Day

7   One no longer exists then the best equivalent program that

8   exists a year or so from now.  He'll also receive substance

9   abuse counselling and treatment; psychological counselling

10  treatment; the requirements of no use of alcohol or any drugs;

11  he can be searched and tested to make sure he's drug and

12  alcohol free; they can search his residence, any vehicle he

13  has and his person. I may have mentioned the victim

14  compensation surcharges were eighty-five dollars total.  That

15  was within eighteen months.  It lets him get the whole Day One

16  program behind him before that burden is placed upon him.  And

17  then because there is substantial hope that if we can find a

18  way to keep him drug and alcohol free that he's still young

19  enough and able-bodied, the assumption is that because of that

20  and because he has no dependents that I know of or that

21  anybody's mentioned, he'd be able to pay restitution.  That

22  will be in an amount not to exceed ten thousand dollars, at a

23  rate of a thousand dollars per year; that comes to roughly

24  twenty dollars a week, or about fifty cents an hour from a

25  paycheck.  He'll have the right to appeal those sentences to

17

'From:Federal Public Defender    To:913184737435    12/20/2010 17:43    #421 P.043/044

1  the Maine Supreme Court, if he wants to, and the reason for

2  the longer sentence in Count III is the presence of the

3  firearm.  The majority of the sentence on all the counts has

4  been suspended because, again, he's still young and we're

5  hopeful that with a lot of work on his part and some help

6  through substance abuse treatment things can still get turned

7  around.  We also have an additional probation condition of no

8  contact with Mr. Jamison Snyder or Mr. Michael Zelinksi.  I

9  don't know Mr. Zelinski, but I met Mr. Snyder on numerous

10  occasions.  He lived in the Sanford area when I first met him,

11  and he's been in a lot of trouble and it's probably best for

12  Mr. Bender that they not get back together again.

13       (INDEX NUMBERS 2056 - 3701 NOT TRANSCRIBED, UNRELATED

14  MATTERS HEARD)

15       COURT:  Mr. Chester?

16       MR. CHESTER:  Yes, Your Honor.  With regard to the Bender

17  matter, in York County the requirement that he pay restitution

18  at the rate of a thousand dollars per year was suspended for

19  the first year, in the expectation that he would be unable to

20  (INAUDIBLE).

21       COURT:  Some programs you work and earn money, others you

22  don't; but I'll add that no restitution is required during the

23  first year of probation.

24       MR. CHESTER:  Thank you.

25       END OF HEARING.

18

CERTIFICATION

I HEREBY CERTIFY that the foregoing, pages 3 through 18, is a true transcript of Tape Number 1350, Index Numbers 520 - 2055 and 3702 - 3780, recorded on Friday, November 1, 1996, by Joanne Hebert, at the Maine Superior Court located at Portland, Maine, of the case entitled STATE OF MAINE v. JEREMY BENDER.

Dated: June 11, 1999

Patricia M. Champagne
Notary Public

19